## TURNER *v.* THE STATE.

1. The instructions on the subject of admissions were not open to the objections made thereto.
2. There was evidence authorizing a charge on conspiracy.
3. The admission of irrelevant evidence is not cause for a new trial, where it is obvious that such evidence was not harmful to the accused.
4. There was sufficient evidence to warrant the verdict, and the court did not err in refusing a new trial.

NOVEMBER 13, 1912.

Indictment for murder. Before Judge Daniel. Butts superior court. June 13, 1912.

*O. M. Duke, W. E. Watkins, J. A. King, R. W. Mays,* and *H. M. Fletcher,* for plaintiff in error. *T. S. Felder, attorney-general,* and *J. W. Wise, solicitor-general,* contra.

J. C. Turner, George Turner, Alonzo Turner, and Charlie Turner were jointly indicted for the murder of Jesse Singley. J. C. Turner, hereinafter referred to as the accused, was separately tried. The evidence introduced by the State tended to show the following facts: The accused, one of his brothers, and their father, Bill Turner, negroes, were employees at the Elder House, a hotel at Indian Springs. The accused and this brother had a fight at the hotel, about 3.30 o'clock in the afternoon, which Bill Turner and the clerk at the hotel, Lane, a white man, endeavored to suppress. The clerk got into an altercation with one of the brothers, and these two endeavored to strike each other. Subsequently both went away and returned, the clerk with a pistol and the other with a rifle, but no further trouble ensued between them. The clerk left Indian Springs for Macon, about 6 o'clock, and did not return for some days thereafter. On the trial the clerk failed to identify the accused, and pointed out as the accused one of his brothers. About 4.30 o'clock of the same afternoon, the deputy sheriff of Butts county and several other white men went to Indian Springs, the deputy having heard that there was a riot and that a negro was trying to enter the Elder House. They went to the house of Bill Turner, searching for the accused. Bill Turner demanded of them by what authority his house was being searched, and the accused, who was in the house, got mad about it, and the deputy sheriff put a handcuff on him, which "got up a right smart stir," and several other negroes, who were near the house, "crowded up" towards it, but were made to "get back" by threats of one of the

white men that "if they did not get back" he would kill them. Bill Turner made the accused "sit down and behave," and the handcuff was then taken off. Then the deputy sheriff and his party left without taking any one with them. This was according to the testimony of one of the men with the deputy sheriff. The deputy testified that when he and his party went to Bill Turner's house, nobody was in the house and that "in a minute or so Bill Turner and that boy Charlie [brother of the accused] came up, and several negroes were further down the road. They never did get to the house. I did not see J. C. [the accused]; if I did, I did not know him. . . I saw a single-barrel breech-loader shotgun. I searched the house. . . We went to Bill's house to search for Alonzo [another brother of the accused]." Between 8 and 9 o'clock on the night of the same day, Bill Turner was seen to come from the lot of the Elder House, with a rifle, and five or six other people, who were not identified, joined him in front of a stable which stood between the hotel and Bill's house. Bill loaded his gun there, and he and those with him went up the road towards his house. Within a few minutes thereafter Jesse Singley and five other white men, who had been at Indian Springs on account of the rumored trouble there, were returning home along the road which Bill Turner and his party had taken. When Singley and his party were within 100 or 125 yards from Bill's house, they were fired upon by one or more persons who were in a field near the road. Five or six shots were fired from the field, one sounding like the report of a shotgun and the others like a rifle or pistol. Jesse Singley was shot through both legs with a rifle bullet, and died from the wound. Another in his party was wounded, but recovered. After the shooting four or five persons were heard running from the place whence the shots came, to Bill's house, and the slamming of a door or window there was heard. They remained at the house a short time, and then came out and went down the road towards Indian Springs. About 10 minutes after the shooting, Bill Turner and another man, who was not identified, were seen with guns to come out of the woods in the rear of the hotel and to enter it. Both went into a room, and Bill came out without a gun. The other man was not afterwards seen about the hotel. In 10 or 20 minutes after the shooting, the accused was seen "traveling in sort of a long trot," coming from the direction of Bill's house and going along ·

the road from Indian Springs towards Forsyth. The witness who testified to this said that he and his wife were sitting on the veranda at their home when the accused passed along the road about 30 or 40 feet from the house. He further testified that his wife spoke to the accused and said, "J. C., what are you doing here, and where are you going? You had better get away from here; they will kill you for shooting that way." The accused said, "I am going now." After the shooting the sheriff of Butts county went, that night, to Bill Turner's house and found it locked and the windows fastened, and no one was in the house. Three guns were found in the house, two single-barreled breech-loaders and an old muzzle-loader, which seemed not to be in shooting condition. The accused was arrested in Macon, Bibb county, about a week or two after the shooting. A negro detective, who had been for many years connected with the sheriff's office of that county, testified that he and a deputy sheriff of that county, Williams, arrested the accused, and that he voluntarily stated to the detective and Williams "that he [the accused] was present at the time Mr. Singley was shot; he said he did not do the shooting; he said if he did run to the swamp he did not do the shooting. He said he was there with his father. He did not say when he went to the place. He said, when his father shot he ran to the branch. . . He said that he and his father and another boy were present. I disremember whether he said who was with him." Williams testified, in reference to the same conversation between himself and the accused in the presence of the detective, as follows: "I asked him [the accused] : 'Why did you kill that white man up there?' He said : 'I didn't kill him, but father did.' He said : 'I ran to the branch and came on to Macon.' He said he did not do it, 'Father did the shooting.'" Another witness testified that there was a branch near the scene of the homicide. No evidence was introduced by the accused. He made the following statement to the jury: "I don't know anything about this killing I am charged with. I was at home, and didn't know about it at all. I have got some witnesses to show I did not know anything about it until afterwards. The hotel closed, and I left for home. I want witnesses to show where I was. They know."

There was a verdict of guilty, with recommendation of life im-

prisonment. The accused moved for a new trial, which being refused, he excepted.

FISH, C. J. (After stating the foregoing facts.)

1. One of the grounds of the motion for new trial is that the court erred in instructing the jury as follows: "An admission, as applied to a criminal case, is the statement made by the defendant of a fact or facts pertinent to the issue, or [and?] tending, in connection with other facts or circumstances, to prove the guilt of the accused, but which of itself is not enough to authorize a conviction." The errors assigned upon this instruction are that it "is not a correct definition of an admission, and is not a correct statement of the law. Further, it is error to charge on admissions. Admissions apply to civil cases; confessions to criminal cases. The law is stricter on the sufficiency and admissibility of confessions than for admissions." Immediately following the instruction above quoted, the court charged as follows: "If the jury believe any admission was made by the defendant in this case as to any fact or facts illustrating his guilt or innocence, you may consider the same in connection with and in the light of any other facts bearing upon the guilt or innocence of the accused, and from all the evidence given, and considering the defendant's statement, determine the guilt or innocence of the accused. I charge that all admissions should be scanned with care and received with great caution. An admission uncorroborated by other evidence is not sufficient to justify a conviction; an admission is a circumstance which requires the aid of testimony to authorize a reasonable conclusion of guilt." The instruction is not erroneous for any of the reasons assigned, especially when considered in connection with the charge which immediately followed it, as above set forth. *Ransom* v. *State*, 2 *Ga. App.* 826 (59 S. E. 101).

2. The motion assigns error upon the following excerpt from the charge: "A conspiracy may be defined as a combination or agreement between two or more persons to do an unlawful act. Whether or not there was a conspiracy in this case is for you to decide from the evidence. The existence or non-existence of a conspiracy or common intent may be established by proof of acts and conduct or by proof of express agreements, if any. If you determine that there was a conspiracy between two or more persons to do the act alleged in the indictment, then I charge you that any

act done in pursuance of that agreement by any one of the persons to the agreement is the act of both or all, if done within the scope of the agreement. If you believe that there was a conspiracy or common intent between the defendant and another or others to do the unlawful act charged in the indictment, then I charge you, if one of the others to the conspiracy or common intent, if there was such, did the act alleged in the indictment, that is, killed Jesse Singley, and the defendant stood by, aiding, assisting, and abetting the act to be done, then he would be guilty of the act that the one who struck the fatal blow would be guilty of." The exception to this charge is that there was no evidence to authorize the charge on the subject of conspiracy. The exception is not meritorious. A conspiracy may be shown by circumstantial as well as by direct evidence. *Weaver* v. *State*, 135 *Ga.* 317 (69 S. E. 488), and cit. The circumstances in evidence were amply sufficient to authorize a fair inference by the jury that the accused and his father, Bill Turner, and perhaps others conspired to shoot Jesse Singley and others who were with him at the time they were fired on. There was evidence tending to show that Bill Turner, the accused, and probably one or more of his brothers had no good feeling towards the white men, on account of the incidents which occurred in the afternoon, and as set forth in the statement of facts preceding this opinion. Bill Turner with several other persons, he being armed with a loaded rifle, was seen a few minutes prior to the homicide, going in the direction where it occurred. It was at night, and Singley and those with him were fired upon in the dark, and from a field near the road which Singley and his party were traveling, six shots being fired at them. In fact Singley was assassinated from ambush. The accused when leaving the place about 10 or 20 minutes after the shooting, was accosted and asked: "What are you doing here, and where are you going? You had better get away from here; they will kill you for shooting that way." And he replied: "I am going now." Moreover, he admitted that he was present when the shooting occurred, and that his father did the shooting, and stated that he (the accused) did not shoot. He fled and went to the city of Macon, where he was subsequently arrested. If he was with his father when the latter shot from ambush and killed Singley, a very strong inference arises, from that fact, that he was acting in concert with his father in

the latter's purpose to assassinate Singley, or some of them who accompanied him. There was no evidence that the accused attemped to dissuade his father from shooting, and from the facts and circumstances in evidence the jury might fairly infer that he was there aiding and abetting his father in what he did.

3. Complaint is also made that the court erred in permitting Lane to answer the following question: "What happened, if anything, that evening?" The answer was: "They had a fuss down there." And in permitting the same witness to answer the question: "Who had a fuss?" The answer was: "J. C. Turner and his next brother." These questions and answers were objected to as being irrelevant. Granting their irrelevancy, it is obvious that they alone were not harmful to the accused.

4. The only other grounds of the motion are that the verdict was contrary to law and the evidence, and without evidence to support it. In our opinion there was evidence to authorize the verdict, and the court did not err in refusing a new trial.

*Judgment affirmed. All the Justices concur.*