### 23446. SMITH v. THE STATE.

DECIDED NOVEMBER 4, 1933.

*Porter & Mebane, J. L. Wallace,* for plaintiff in error.
*James F. Kelly, solicitor-general, J. Ralph Rosser,* contra.

GUERRY, J. The defendant was convicted of the offense of stealing an automobile, the property of W. L. Andrews. On the night of the alleged larceny, and at approximately 7 o'clock, three negroes, Clifford Printup, Perry Waters, and R. T. Stewart, met on a street in the city of Rome, and decided to rent an automobile and take a "joy ride." Hubert Smith, the defendant was in the employment of Eugene Grace, who, with his brother Charlie Grace, oper-

ated a taxi business on Broad street which was within a few doors of the Andrews Taxi Company. One of the negroes, Clifford Printup, was also in the employment of the Grace Taxi Company. The automobile was hired from Mr. Andrews, the prosecutor. The automobile was driven around over different streets of the city of Rome, until finally it was parked on a street in front of the house of a negro by the name of Ed. Gaines, alias "Flat Top." At this place, the evidence of the State shows, the larceny was committed. Counsel for plaintiff in error agree that the general grounds of their motion for a new trial are without merit, and after a careful perusal of the record in the case, we are ready, without doubt or hesitancy, to agree with them. However, there are two special grounds the consideration of which will necessitate a statement of some of the evidence in the case. The first of these grounds is that the court erred in allowing a witness for the State, Ray Early, to testify as follows: "I called Charley Grace. He answered the telephone. That is Mr. Charley Grace sitting over there. As to whether or not he has an automobile missing, I called their place and Mr. Charley Grace answered, and I asked him if he had an automobile out, and he said he did not, and I said 'One of your cars has been reported wrecked on the Calhoun road,' and he says, 'My negro here might have one running around here in one.' That is the conversation that Charley and myself had. I took it for granted that he meant Printup." The objection to this testimony was that it was hearsay, and that even if a criminal conspiracy had been proved between the defendant and the declarant, the object of the crime had already been consummated, and therefore it was not admissible as a declaration of a coconspirator. The next ground of the motion for a new trial is that the court erred in allowing the witness Perry Waters to testify as follows: "We just got in the car and Clifford drove us out the old Bell Ferry Road, and Clifford parked the automobile there inside Mr. Grace's yard and got out and went to the house and left R. T. and myself in the car, and he come back with some money, and I don't know how much money he had, and handed R. T. a dollar, and he says, 'Gene will send some more money.'" Substantially the same objection was made to this testimony as to that in the first special ground, quoted above.

Perry Waters, a witness for the State, testified that he knew Hubert Smith, the defendant, Clifford Printup, and R. T. Stewart.

He and R. T. Stewart met on Broad street, in the city of Rome, and, on walking down the street together, met Clifford Printup. Clifford had some money rattling it, and wanted R. T. to rent an automobile, telling R. T. not to rent it from Mr. Grace, but to get it from Mr. Andrews. R. T. left and rented the automobile and picked him up at the river bridge, and they drove on across the bridge where Clifford Printup was talking to Gene Grace and Hubert Smith, the defendant. Clifford got in the car and they drove to a place known as Duk's stand, and Hubert Smith and Gene Grace followed them. From there they went to Louise Williams' house, and this car (referring to the car of Gene Grace and Hubert Smith) went on by them and parked a little further down the street. They left this place and drove to several other places, and finally stopped at Ed. Gaines' house, alias Flat Top, and as they went in the house Gene Grace and Hubert Smith came up again and passed a little by the house and parked, and Clifford walked down to the automobile and talked to them a little while, and they drove off. After a time they left the house and took a girl home and then returned. On their return Mr. Smith and Mr. Grace drove a little past the house and parked with their lights on, and Clifford went down and talked to them. Mr. Smith got out of his car and drove the Andrews car off and returned with Mr. Grace in Mr. Grace's car in about 25 minutes and handed the key to Clifford and then drove off. At this point the negroes separated, and in a few minutes the witness was picked up by Clifford, who was in Mr. Grace's car, and who asked him to come and go to Chattanooga with him, to which proposal he assented and got in the car. They picked up R. T. Stewart and Clifford drove them out to Mr. Gene Grace's house and parked the car in the yard. After asking where they were going to get any gas, Clifford went in the house and came back with some money and said, "Gene will send some more money." In driving back through town they met Mr. Andrews, the man from whom the stolen car was rented, who followed them until the witness made Clifford stop, and Mr. Andrews parked in front of them, where they stayed about five minutes, and they then drove off. (The witness does not testify as to what happened while they were stopped.) Mr. Andrews followed them and Clifford said, "They want me," and drove on faster until they ran into a ditch and turned over. Mr. Andrews passed by and asked if any

one was hurt, and then drove on back toward Rome. Witness and R. T. Stewart started walking back towards Rome and met Mr. Charley Grace and Mr. Smith, the defendant, who made them get in their car and go back to the scene of the wreck, where the following took place: "Mr. Smith and Mr. Grace and myself and Clifford turned the car back over, and Mr. Smith asked Mr. Grace about how much he had, and he said 'a couple of dollars,' and then he said, 'We will put this negro on a freight and let him go on to Chattanooga,' and R. T. says, 'I am going back to Rome,' and he says, 'Damned if you do, you are going back to Chattanooga,' and he says, 'If you don't keep your damn mouth shut we are going to kill you.'" They came back to town and went to Mr. Gene Grace's house where Clifford talked to him, and after their conversation was over they drove to Mr. Charley Grace's house, and Mr. Smith drove him home. He saw no more of Mr. Grace or Mr. Smith until about twelve-thirty that day when they drove out to his house and told him "to keep his damned mouth shut;" and in about half an hour after they left, "the law came." R. T. Stewart, a witness for the State, testified to materially the same facts as did Perry Waters, with the exception that he did not see Mr. Smith drive Mr. Andrews' car off. Ray Early, a witness for the State, testified that "about the 31st day of January of this year Mr. Andrews reported to me about a car being stolen from him, and at the same time he reported that one of Mr. Grace's cars had been wrecked. I called Charley Grace." (The conversation that ensued is the one objected to in the first ground of the motion for a new trial.) It was further shown by the evidence for the State that a short while after the commission of the larceny Mr. Charley Grace came in company with Mr. Smith, the defendant, to the scene of the wreck; that Mr. Charley Grace was present and said nothing when the defendant was telling Perry Waters to keep his damned mouth shut; that he was asked by the defendant how much money he had, so that one of the negroes could be sent off, and one of the witnesses for the State testified that Mr. Charley Grace took him in his car and drove him to Chattanooga and told him not to return to Rome, and not to communicate with him unless he needed money. R. T. Stewart further swore that while on the way to Chattanooga Mr. Smith, the defendant, said: "We got the God damn thing, and we are going to put the son of a bitch out of business."

The evident theory upon which the State made out its case against the defendant was: that there was a conspiracy between Mr. Gene Grace and Charley Grace, brothers, the defendant, and the negro Printup, to steal one of Mr. Andrews' cars and burn it up, as the car was found the next morning out on the road, burned; that in pursuance of the conspiracy Printup had R. T. Stewart to rent a car from Mr. Andrews, so that Mr. Gene Grace and Mr. Smith might steal it from them as they went in somebody's house; that Mr. Smith and Mr. Grace did follow them, had conversations with Clifford Printup, and finally the defendant got in the car and drove it off; that Clifford then, to fully cover up the crime, got one of Mr. Grace's cars and was going to drive Perry and R. T. Stewart to Chattanooga; that he obtained money from Mr. Gene Grace and had evidently started on this mission when he was followed by Mr. Andrews.

It has been settled in Georgia that declarations and acts of individuals can not be introduced against the defendant for the purpose of proving a conspiracy, but that such must be shown aliunde, to render such declarations admissible as declarations of coconspirators. Quoting from *Wall* v. *State*, 153 *Ga.* 309, 318 (112 S. E. 142): "'No man's connection with a conspiracy can be legally established by what the others did in his absence and without his knowledge and concurrence.' U. S. *v.* Babcock, 3 Dill. (U. S.) 581, 24 Fed. Cas. 1913, No. 14487. The Supreme Court of California said: 'to admit such declarations—such hearsay testimony —in proof of the conspiracy itself would in civil matters "put every man at the mercy of rogues," . . and, in charges of criminal conspiracy, render the innocent the helpless victims of villainous schemes, supported and proved by the prearranged and manufactured evidence of the promoters thereof.' People *v.* Irwin, 77 Cal. 494 (20 Pac. 56). Again, it has been said: 'A species or form of evidence which is in its nature inadmissible, unless some prior or other fact is proved, can not be received to establish the fact, proof of which is an indispensable condition of its own admissibility.' Cuyler *v.* McCartney, 40 N. Y. 221, 33 Barb. 265. The criminal conspiracy can not be shown by declarations of alleged conspirators, not in the presence of, and without the knowledge of, others sought to be bound thereby; but must be established by aliunde proof sufficient to establish prima facie the fact of conspiracy between the

parties." However, such a state of facts may be shown by circumstantial evidence (*Weldon* v. *State,* 158 *Ga.* 140, 123 S. E. 217; *Chance* v. *State,* 156 *Ga.* 428, 119 S. E. 303; *Jones* v. *State,* 38 *Ga. App.* 266, 143 S. E. 613; *Calhoun* v. *State,* 30 *Ga. App.* 263, 117 S. E. 771; *Hooks* v. *State,* 27 *Ga. App.* 587, 110 S. E. 316; *Scoggins* v. *State,* 27 *Ga. App.* 192, 107 S. E. 778; *Dixon* v. *State,* 116 *Ga.* 186, 42 S. E. 357; *Cook* v. *State,* 22 *Ga. App.* 770, 97 S. E. 264; *McLeroy* v. *State,* 125 *Ga.* 240, 54 S. E. 125; *Turner* v. *State,* 138 *Ga.* 808, 76 S. E. 349; *Stevens* v. *State,* 8 *Ga. App.* 217, 68 S. E. 874; *Fisher* v. *State,* 73 *Ga.* 595; *Lynn* v. *State,* 140 *Ga.* 387, 79 S. E. 29; *Young* v. *State,* 151 *Ga.* 401, 107 S. E. 37), as the nature of the thing itself to be proved, that is, a conspiracy, will admit of no other proof unless there be a confession on the part of one of the conspirators.

From the circumstances of the case proved by the State, there can be no doubt that there was prima facie proof of a conspiracy against the defendant, Gene and Charley Grace, and the negro Printup, to steal one of their competitor's cars and destroy it. But counsel for plaintiff in error insists that both declarations complained of were made after the commission of the crime, and that therefore they would be binding only on the declarant. We are aware of the principle of law that where a conspiracy is shown between several persons to commit an unlawful act, acts and declarations of one of them during the pendency of the criminal enterprise are admissible against all (*Foster* v. *Thrasher,* 45 *Ga.* 517; *Horton* v. *State,* 66 *Ga.* 690; *Slaughter* v. *State,* 113 *Ga.* 284, 38 S. E. 854, 84 Am. St. R. 242; *Barrow* v. *State,* 121 *Ga.* 187, 48 S. E. 950; *Harrell* v. *State,* 121 *Ga.* 607, 49 S. E. 703; *Coleman* v. *State,* 141 *Ga.* 731, 737, 82 S. E. 227, 228; *Smith* v. *State,* 148 *Ga.* 332, 96 S. E. 632; *Almand* v. *Thomas,* 148 *Ga.* 369, 96 S. E. 962; *Tate* v. *State,* 41 *Ga. App.* 300, 152 S. E. 609; *Turner* v. *State,* supra; *Wall* v. *State,* supra; *Holbert* v. *Allred,* 24 *Ga. App.* 727, 102 S. E. 192; *Thurmond* v. *State,* 41 *Ga. App.* 430; *Hicks* v. *State,* 11 *Ga. App.* 265, 75 S. E. 12; *Kirksey* v. *State,* 11 *Ga. App.* 142, 74 S. E. 902), and that declarations made by one of the alleged conspirators after the commission of the crime contemplated by the conspiracy, is admissible only against the one who makes it, and that it must be considered as mere narrative of past occurrences as to the others (*Gibbs* v. *State,* 144 *Ga.* 166, 86 S. E. 543; *Hicks* v. *State,* supra;

*Tanner* v. *State,* 161 *Ga.* 193, 130 S. E. 64) ; but it is also true that proof that a crime has been committed does not necessarily prove the end of the conspiracy so as to render acts and declarations of conspirators after that time inadmissible against other conspirators, for the conspiracy may be kept open for various purposes. As is said in 16 C. J. 661: "While the commission of the crime to which a conspiracy relates will in many cases mark the accomplishment of its object and its consequent termination, so as to exclude evidence of subsequent acts or declarations of one conspirator against another, this is not necessarily true, but the conspiracy may continue for various purposes, as for instance the securing of the proceeds of the crime [see, in this connection, *Baker* v. *State,* 17 *Ga. App.* 279, 86 S. E. 530], the division of such proceeds, the concealment of the crime, effecting an escape, the concealment of evidence tending to incriminate the conspirators, procuring witnesses to leave the State, bribing witnesses, influencing witnesses with respect to their testimony, the fabrication of evidence tending to exculpate the conspirators, the fabrication of a defense, or in any way avoiding prosecution or punishment; and where this is the case, the acts and declarations of one conspirator are admissible against the others, where made while the conspiracy continued, although after the actual commission of the crime." In *Byrd* v. *State,* 68 *Ga.* 661, it was ruled that the acts and conduct of one conspirator during the pendency of the wrongful act, not alone in its actual perpetration *but also in its subsequent concealment,* were admissible against another conspirator. In *Carter* v. *State,* 106 *Ga.* 372 (32 S. E. 345, 71 Am. St. R. 262), it was said: "In other words there was, outside of the evidence objected to, proof authorizing the conclusion that the alleged conspiracy embraced a 'criminal enterprise' the scope of which included larceny, arson, *and concealment.*" (Italics ours.) See also, in this connection, *Rawlings* v. *State,* 163 *Ga.* 406 (136 S. E. 448) ; *Coleman* v. *State,* supra. There is no doubt in our minds that both declarations objected to come within the rule announced in the above cases, that is, that the jury were authorized to find that a conspiracy existed between the declarants and the defendant from testimony independent of the declarations, and that both of them were made by the conspirators in an effort to cover up and conceal the crime that had been committed. The court, therefore, did not err in admitting the

804

evidence objected to and in overruling the defendant's motion for new trial.

*Judgment affirmed. Broyles, C. J., and MacIntyre, J., concur.*