26006. CRAIG *v.* THE STATE.

*J. B. G. Logan, G. W. Westmoreland,* for plaintiff in error.
*Clifford Pratt, solicitor-general, E. C. Stark,* contra.

GUERRY, J.  Clifford, alias Jo Bo, Craig was jointly indicted with Myrtie Moore for the murder of J. Kitchens. They were tried together, and the jury returned separate verdicts of voluntary manslaughter. Craig excepted to the overruling of his motion for new trial. The shooting occurred on Sunday night at a filling-station located near Jefferson, Georgia, on the highway leading to Athens, Georgia, commonly known as "Dyson's Station." Kitchens died on the following Tuesday night. The deceased worked at this station, but was not on duty at the time he was killed. It appears that the defendant, Myrtie Moore, and the deceased drove up to this station about 10 or 11 o'clock, and were told by J. W. Segars, who was then in charge, that a poker game was in progress in the back room. They all went in to join the game. The State produced no evidence as to what really occurred in the poker room, except the testimony of J. W. Segars. According to this witness, possibly ten minutes after the three went into the back room, the deceased returned to the front of the station, asked for and procured his blackjack, and then returned to the game. In a short while, again possibly ten minutes, the deceased returned to the front of the station and procured his pistol. He returned to the back room, and nothing was heard until about ten minutes later, when witness heard loud talking and cursing, a general row, and thought he heard the defendant say "You're a G— d— lie," and heard some one answer him in the same terms. A shot was fired, some of the players began to file out of the room, and shortly "Jo Bo and some fellow came out scuffling over a gun. I did not know who he was." The deceased then came out of the room and told the defendant to put up his gun and go home. "Jo Bo told him he wasn't going anywhere and was not putting up his gun." At this time the deceased held a blackjack. The defendant raised his gun towards the deceased "and J. [deceased]

fell over on him trying to catch the gun." With his left hand he caught the defendant's right arm which held a pistol, and "hit him with the blackjack." He "drawed back again when Moore shot him. I do not know whether Moore hit J. or not, he kindly [kind of] jumped." The deceased released the defendant, and "then Jo Bo and Myrtie both began shooting at him while he was going away from them." The defendant and Moore shot two or three times each. The defendant made no remark to Moore, did not ask him to shoot the deceased, nor did he say anything to him before Moore shot. The deceased fell in front of the station. Mrs. Myrtie Hays was sitting in a car just outside the filling-station, when the shooting occurred. She testified that she heard a shot in the back, and saw the defendant and the deceased come out of the door of the back room scuffling. It looked to her that defendant had a gun in his hand which the deceased was holding. She did not see Kitchens do anything to defendant, and deceased did not have a blackjack in his hand. If he had had, she could have seen it. "It seemed that he [deceased] tried to keep them from shooting him, and to knock them off." In other particulars her testimony corresponded with that of Segars. Miss Moline McDonald, who was sitting in the car with Mrs. Hays, testified to a similar version of the affair.

A transcript of the testimony given by Frazier Carithers at the commitment trial was admitted in evidence and read to the jury on motion of the defendant, after a proper showing as to his absence from the State (Code, § 38-314). It appears that when the trouble started this witness was in the station, drinking a bottle of beer. When the first shot was fired in the back room, he walked out of the station and stood by a gasoline pump. When he turned and looked he saw five, six or more men tussling together and saw Moore reach out to try to stop them. He then saw the deceased hit Craig with a blackjack. "Craig jerked loose from him and shot three times. I saw fire come out of his gun that many times. I did not see Moore shoot. Had Moore shot at that time I would have seen it, and I didn't see it. Moore tried to separate them, and that is all I saw Moore try to do. . . I saw Mr. Moore with a gun in his right hand." Witness only heard three shots, but he could have been scared and not heard the rest. "They all were so close together you could not tell just what was

happening." The State introduced Dr. Goss who attended the deceased early Monday morning before day. He found him suffering "from pistol wounds and shock, and had lost a good deal of blood. He had three bullet wounds in him, one in the right elbow, just a simple fracture, a little tip of the bone was broken off. . . He had another wound in his arm, which shattered the bone, and this bullet was still in the bone of the arm. He had another bullet wound to the left of his navel, and that bullet came out of his back. . . One bullet had severed the mensentry, and that is where the loss of blood had taken place." The next morning his condition seemed to be fairly good, "but late in the afternoon he went all to pieces, his pulse became rapid, . . and he died after that from the wounds." E. O. Kitchens, a brother of the deceased, testified that he saw his brother Monday morning shortly after he was operated on. "My brother stated that Jo Bo Craig and Mrytie Moore shot him. He seemed to be conscious at this time; and that is all he said." Mrs. S. K. Kitchens, the mother of the deceased, talked to him Monday night. He "told me Myrtie Moore shot him in the back; he didn't say who shot him in the arm." Fred Culberson, deputy sheriff, saw the deceased in the council room in Jefferson shortly after he was shot. "He seemed to be normal and conscious, but hurting pretty bad. I asked him what was the matter, and he said Jo Bo had shot him. He did not say anything about any one else shooting him." Doc Carithers saw the deceased Monday morning soon after he came out from under the anesthetic. "I asked him who shot him, and he said Jo Bo."

The defendant introduced Dr. Stovall, who testified that he was called to the home of the defendant on Monday morning before daylight. "I found him suffering from two knots on his head, one large one about the size of an orange, and a smaller one about the size of a lemon. . . I found him semi-conscious. He remained in this condition two or three days." In the opinion of this witness, the wounds were produced by a blunt instrument. He also treated Moore for a superficial scalp wound. H. L. Purcell, bailiff, got a gun off Myrtie Moore the night deceased died. Part of the hammer of the gun had been freshly broken off. Myrtie Moore stated to the jury, that when they went back to the poker room he was asked by Beeler Shumake to play his hand. He and

Lon Blalock got in an argument, and they both "jumped up." Then the defendant and the deceased got into an argument, and "J. stuck his gun in my belly and said he would shoot me, and when he stuck it in there he moved over and shot by the side of me, and they all commenced going out. . . but me and John Flanigan. . . We heard scuffling out there, and J. started out and I asked him not to go out there, and he went on out, and Jo Bo was standing in the front door, and J. hit him in the head with a blackjack. I had my gun like this [indicating down by side], and took hold of J's arm and asked him not to do that, and he hit me with the blackjack, and I fell over on the pavement, and Jo Bo shot and he [Kitchens] fell. . . I picked up that little piece of hammer off the pavement." The defendant Craig stated to the jury that he and Blalock got into a difficulty over an "ace," and they both "raised up." "J. then stuck his gun in my stomach, and I said, 'J. don't do that,' . . and he took the gun off of me and put in on Myrtie, and he said I'll just shoot you, . . and he turned the gun off and shot, and hit me with the blackjack." He made an attempt to get out and the deceased grabbed him. He asked Shumake to knock deceased loose, so he could get his gun out. Deceased hit him again, and "when he hit me the last time he knocked me unconscious, and I don't know whether I shot him or not."

Counsel for the plaintiff in error states in his brief that there are three questions to be decided by this court. They are substantially: (1) Did the evidence demand a finding of justifiable homicide? (2) Did the court err in giving in charge to the jury the law concerning a conspiracy? (3) Did the court err in giving in charge the law in reference to dying declarations? We will discuss these questions in their respective order.

■ After a careful and thorough study of the brief of evidence, we entertain no hesitancy in holding that the evidence did not demand a finding that the killing was justifiable. The jury were amply authorized to find either a verdict of murder, or one of voluntary manslaughter arising out of a mutual intent to fight. *Goodin* v. *State,* 126 *Ga.* 560 (55 S. E. 503). We think an extended discussion of this question is unnecessary. ·

■ On the second question we have entertained some doubt. However, after an examination of many authorities, we are con-

vinced that the judge did not err in charging the jury on the law of conspiracy. A conspiracy in criminal law is a combination or agreement between two or more persons to do an unlawful act, and this may be established by proof of acts and conduct as well as by direct proof or by express agreement. *Carter* v. *State,* 141 *Ga.* 308 (80 S. E. 995) ; *Smith* v. *State,* 47 *Ga. App.* 797 (171 S. E. 578), and cit. The evidence disclosed that this defendant and the joint defendant, Moore, were employed at the same service-station, and that they came to the scene of the difficulty together with the deceased; according to their own testimony there occurred a difficulty in the poker room between the deceased on the one hand and them on the other, he threatening both of them with a pistol. The defendant became involved in a tussle with the deceased, and Moore stepped to the door and shot at the deceased; and when the deceased turned and ran, both the defendant and Moore fired several shots at him. The evidence indicated a common and mutual design on their part against the deceased. At the moment they "breathed together." In *Davis* v. *State,* 114 *Ga.* 104 (39 S. E. 906), it was said: "Counsel for the plaintiffs in error laid great stress, in the argument here, upon the fact that no prearrangement or agreement among the defendants had been shown. We understood his contention to be that, before a conspiracy or common intent could be established, it was necessary for the State to show that such agreement or arrangement had been expressly entered into before the fight was begun, and that, unless this was shown, it was error to charge upon the subject. We think that this contention is not sound. Conspiracy or common intent may be established by proof of acts and conduct as well as of previous express agreement." In that case, as in the present, no previous enmity between the deceased and the defendants was shown; they were all on good terms, throwing "crack-a-loo" for cider. When the deceased and his father started home, Fordham, one jointly indicted with the defendant, became involved with the deceased over some cider which the deceased was taking home. In the argument, the others jointly indicted with the defendant took sides with the defendant, and some beat the deceased to death, while others held his father at bay. In *Walker* v. *State,* 136 *Ga.* 126 (70 S. E. 1016), the facts were similar to those of the case at bar. The Supreme Court held that the court was

authorized to charge on the law of conspiracy. We are of the opinion that it was not for the judge, under the evidence submitted, to determine as a matter of law that a conspiracy between the defendant and Moore did not exist, and that he properly submitted that question to the jury for their determination. See *McLeroy* v. *State*, 125 *Ga.* 240 (54 S. E. 125) ; *Hudgins* v. *State*, 61 *Ga.* 182.

■ As shown by the statement of facts already set out, the State introduced several declarations of the deceased, after he was shot, as to who shot him. No objection was made to the introduction of these declarations. Complaint is made that the charge of the court to the jury on dying declarations was without evidence to support it. In *Williams* v. *State*, 139 *Ga.* 688 (77 S. E. 1062), it was said: "Where testimony *relating to a dying declaration of the decedent* [italics ours] is received in evidence, and no objection is made thereto, it is not error for the court to give in charge to the jury the legal principles applicable to dying declarations." This ruling disposes of this question. The judge did not err in overruling the motion for new trial.

*Judgment affirmed. Broyles, C. J., and MacIntyre, J., concur.*