## STILES *v.* THE STATE.

1. When an attack is made upon a juror after verdict, because of bias and prejudice towards the defendant, and there is evidence pro and con upon the subject, the finding of the trial judge in favor of the competency of the juror will not be reversed, it not appearing from all the facts that he abused his discretion.

2. In the absence of an appropriate written request, it is not error to omit to charge the law in relation to the impeachment of a witness.

3. There is evidence to support the verdict, which has been approved by the trial judge, and we cannot say that he abused his discretion in refusing a new trial.

No. 3294.    August 17, 1922.

Indictment for murder. Before Judge Wright. Chattooga superior court. June 10, 1922.

W. R. Stiles was indicted for the murder of John Hurt, in Chattooga county, on February 12, 1922. The State relied for conviction solely on dying declarations made by the deceased. The deceased died from the effects of a wound inflicted by a pistol. The ball entered practically on a level with the nipple on the left side, a little more than an inch towards the center of the chest from the nipple, and ranged backwards and upwards. It had the appearance of being fired from an angle. When shot the deceased was wearing a pair of blue overalls, army shirt, and some kind of a coat. There was in the overalls an indication of the bullet having passed through them. The hole in the overalls corresponded with the wound in his body. The deceased was shot on Sunday evening, early in the night. He was taken to the office of Dr. Wood, about eight o'clock that night. He died on the following Tuesday morning. Dr. Wood had a conversation with the deceased as to the cause of the wound, and who inflicted it. He was then in the article of death. He was conscious of his condition. He said he was conscious of the fact that he was dying, and the doctor told him that he had no chance to recover. So did Dr. Martin. The deceased was talking at random. He did not make a complete statement that night, but he told who shot him, and that was about all he said then. The first statement he made to Dr. Wood after he came into his office was, "Doctor, give me a shot, give me a hypodermic, I am dying." The doctor gave him a hypodermic of hyoscine, composed of morphine and cactus. A little later in

the night the doctor gave him another hypodermic, because he was suffering such excruciating pain. Not far from twelve o'clock on Monday the deceased went into fuller details of the difficulty, at the defendant's home. He said he was going to die, and that he was going to tell everything just as it occurred. He said he was lying on the bed that Sunday night, late in the evening or in the early part of the night, and that Ramsey came into the room, with a big knife in his hand, advanced on Hunt and said "I am going to cut the damned son of a bitch's head off." The deceased said Ramsey was the defendant's son-in-law. Dr. Wood then asked him, "What did Ramsey want to cut your head off for, John?" He said Roxie had tattled. The doctor asked who was Roxie. He said that she was the defendant's single daughter. The doctor asked him what Roxie wanted to tattle for. The deceased said she was jealous. Smiling at the deceased, the doctor said, "You have not been having relations with the whole family?" and the deceased said, "All but the baby." About that time the deceased seemed to be unable to talk further. After a little while he said, "We had gambled; I had broken the game, and after Mr. Stiles [the defendant] shot me he took the money away from me." He said Mr. Stiles, the defendant, shot him. He said, when he left Mr. Hambree's, he came down to the pasture back of the barn lot; when he got even with the barn the defendant called him, told him to come up there, that he wanted to talk to him. When he got up there the defendant told him to go to the house. The deceased told him, no, he was going home. The defendant told him he did not have anything against him, and, if he had any fighting to do, that he, the defendant, would do it for him. The deceased told him, no, he was not going to the house any more; he was going home. At that time the deceased had not got quite up to the defendant. They were talking a few feet apart. The defendant said to the deceased, "Well, I have got your cap; come here and I will give you your cap." The deceased walked up to the defendant; the defendant took the cap of the deceased out of his pocket and gave it to the deceased. The deceased then stuck a cigarette in his mouth, reached over to strike a match, and as he struck the match and raised up to put it to the cigarette he noticed a pistol in the hand of the defendant. The pistol fired, producing the wound from which the deceased died.

When the deceased fell the defendant threw the pistol down, ran to the house, and in a little bit the defendant and some women folks and perhaps others came back to where he was lying. The defendant then said, " John that was an accident, I would not have shot you for, anything."

The deceased further said the difficulty between him and Ramsey took place at the defendant's house; that he jumped out of the window and ran to Mr. Hambree's. After they carried the deceased home Dr. Wood gave him a third hypodermic of hyoscine. The next morning about eight o'clock the doctor gave him another hypodermic, and some time between one and two o'clock in the afternoon of Monday he gave him another one. About nine o'clock that night the doctor gave him another. About three o'clock Tuesday morning he gave him another hypodermic. This was just after daylight Tuesday morning. The deceased talked more freely the next day after his medicine had been administered. He made two statements to Dr. Wood, one on Sunday night, and one on Monday. He said he had gambled, that the defendant shot him, and added that the defendant took the money away from him. He did not say that the defendant took it immediately after shooting him. He said the defendant shot him, threw the gun down, and ran to his house. The first reason the deceased gave for the trouble was that Ramsey had run in on him with a big knife and he jumped out of the window. He did not connect the defendant with any trouble that he had at the house.

The deceased made a statement to J. C. Hutchins soon after he was shot. He told this witness that he was shot. At the time he looked like he was going to sink down and die any moment. He was sitting on the edge of the bed, spitting up blood. He said, " Mr. Hutchins, I am shot, and I want to make my dying statement to you." This witness asked the deceased where he was, and he said up at Stiles '; that Riley Stiles, the defendant, shot him. He did not tell why Stiles shot him. He said the defendant shot him " here " (indicating the place where he was shot). He said that the defendant tried to make out it was a mistake, but it was not. The deceased said he had two big hogs and one little one at the defendant's house, and said he wanted his folks to know about them. The deceased looked at this witness while he was in a weak, dying condition, was conscious of what he was saying, seemed to be in great pain, and the witness smelt no liquor.

The deceased made a statement the night he was shot, in the presence of Berry Hutchins. He was brought to the house of this witness by Claude Hambree. The father of this witness came up to the house that night. The deceased seemed to have "right smart" of strength. He had to sit down on the bed. The witness sat down near him. The deceased said to the father of this witness, 'I want to make you my dying statement.' The father of the witness asked the deceased who shot him, and he said Mr. Stiles, Riley Stiles (the defendant), and the deceased said he had three hogs up there at Mr. Stiles'. Claude Hambree and this witness carried the deceased to Dr. Wood's. This witness heard the deceased tell Dr. Wood at his office who shot him, that Riley Stiles shot him.

A witness for the State testified that he saw the deceased late Sunday afternoon, and not notice that he was drinking. The deceased could have had some whisky and the witness might not have noticed it. There was medical evidence introduced by the State that a hypodermic of hyoscine has a soothing effect, and that eight tablets during a period of 36 or 48 hours to a man mortally wounded would not be an overdose. It would depend, of course, on how much morphine or hyoscine the tablets had in them. Some have a quarter of a grain, and some an eighth of a grain. An overdose would have depressing effect. If you gave a person three tablets of hyoscine in twelve hours, it might affect the spine and brain, if you gave hyoscine alone; but the combination would not.

Dr. Hall, for the defendant, testified that eight tablets of hyoscine, administered to a person who had been dissipating for weeks or days, and after he had been wounded, as indicated by the evidence of the State, would have a depressing effect on his mental faculties. The effect would lessen the respiratory and circulatory action. One of those tablets with a fiftieth of a grain would affect his spine and brain. Hyoscine has an effect on the motor tract of the spinal cord as a depresser. It would not stimulate. It would weaken and depress the mind. If you kept administering hyoscine doses very often, it would cause complete depression of the mental faculties. There would be a delusion brought about by his weakened condition by repeated doses too often. A man would not be in his mind, and would tell things that were not so. Hyoscine

is composed of hyoscine, morphine, and cactus. He did not think it was a proper medicine to give a wounded man. A wound in the lung or other part of the body shocks and depresses the condition of the body, and instead of giving it a depresser you should give a stimulant.

W. M Calloway, for the defendant, testified: He was at the home of the defendant the night when the deceased was shot. They were eating the supper that night, when a gun fired from the lane next to the barn. After the gun fired the people jumped up in the house, and ran down there. They found the deceased on the outside of the fence, on the side away from the defendant's house. When this witness got there, Mr. Stiles, Gordon Stiles, and Roxie Stiles were there. The defendant was sitting at the table in dining-room at supper when the gun fired. Jim Ramsey, his wife, the son of the defendant, Mr. Stiles, and the baby in the high chair were at the table. The reason this witness did not go down with the others, some one holloaed, "Bring a light." He went to the dining-room, got the lamp off the table, and carried it with him. He met Mrs. Stiles coming back, and she had an automatic pistol in her hand. The witness said to the deceased, "What's the matter, boy?" The deceased said, "Bill, I got a damned three-eighty right through there." There is an automatic pistol that shoots three-eighty shells. The deceased said, "Bill, get me a doctor; do something for me as quick as you can." With the assistance of the defendant this witness helped the deceased over the fence, and put him in a buggy. The deceased had his right arm around the neck of this witness, his left arm around the defendant's neck. The witness said, "John, have you shot yourself, or has somebody shot you?" The deceased said, "No, Bill, I done it; I will see you later and tell you." The deceased was drinking Friday, Saturday, and Sunday. When he got back Sunday he was drinking pretty heavily in the evening. He borrowed $1.25 from this witness Sunday evening. This witness did not hear any difficulty between Ramsey and the deceased that Sunday. He was in the far room, lying on the bed, at the time.

Gordon Stiles, a son of the defendant, Roxie Stiles, a daughter of the defendant, and Jim Ramsey testified that they, Bill Callaway, and the wife of the defendant were eating supper at the

time the shot was fired which killed the deceased. When the shot fired somebody holloaed, " Oh Lordy! " They immediately went out to where the deceased was shot. Roxie Stiles and Ramsey and Gordon Stiles testified that the deceased was drinking. Jim Ramsey denied that he had any difficulty with the deceased that day at the home of the defendant, who is the father-in-law of this witness. There was evidence that an automatic pistol shooting three-eighty shells with white powder would not show powder burns on cloth over three inches from the place at which such pistol was fired.

The defendant made a statement in which he gave his version of the homicide. He said that the deceased had whisky hid in the corner of the barn. Sunday evening the deceased was pretty full. Sunday morning he got tanked up and went to the shop of the defendant and laid down. The defendant got him up, and made him go to the house and go to bed. The defendant told him not to lie out there where people could see him. Sunday morning the deceased went to Summerville. When he came back Sunday evening " he got plum full again; he lay down on the back porch next to the kitchen." The defendant went to the far barn, fed the cattle, came back, fed the stock at the other barn, the hogs at the back of the shop, and then went to Mrs. Alice Hutchins' three hundred yards away, got some eggs, and came back. Did not see anything of the deceased on the back porch. Did not know where he was. His wife got supper after awhile. They went in and sat down to supper. Some one said " Where is John? " and no one knew. His wife went to the back porch and called the deceased twice. He made no answer. She came back, and all sat down to the table. About the time they got settled they heard a gun fire, and some one holloaed " Oh Lord! " All got up excited. He ran to the front door, the rest ran out through the kitchen and the back door next to where the deceased was. The defendant ran around the house. His wife, Gordon, and Roxie beat him to the deceased. When he got there he said, " What's the matter? " His wife said, " John has shot himself." The wife of the defendant asked the deceased " how come him shot." The deceased said it was an accident. Mrs. Callaway asked the deceased when he got in the buggy, " How come this? Did you do it, or did some one shoot you? " and the deceased said, " I done it myself."

Gordon Stiles was recalled for the purpose of laying the foundation for his impeachment, and swore that he did not tell Bryant Ragland, the mail-carrier, the next day after the deceased was shot, over at Chelsea that his father was down at the barn feeding when this shot was fired, but when he got down there his father was with John Hurt. He did not tell him that at that time or at any other time. Bryant Ragland, for the State, testified that he remembered the Sunday night that John Hurt got shot. He was on his mail route the next day, saw Gordon Stiles, and had a conversation with him. Gordon said they were sitting down to supper, and his father was feeding. They heard the gun fire, and a man holloaed. Said his mother screamed, saying, " Lord have mercy, somebody is shot." They jumped up and ran out there, and Mr. Stiles (the defendant) was there with John (the deceased), and said, " John is shot, boys." Hitched up a buggy and carried him to the doctor as quickly as possible.

The jury found the defendant guilty, with a recommendation to mercy. He moved for a new trial on the formal grounds, and afterwards amended his motion for a new trial by adding two grounds. One of these was based upon prejudice and bias of W. S. Young, one of the jurors who tried this case; the other complained that the court erred in failing to charge " the law regulating the impeachment of witnesses," the State having offered evidence of statements by Gordon Stiles contradictory of his statement in this case, the said Gordon Stiles being a material witness for the defendant. In support of the ground that the juror Young was incompetent to try the case on account of bias and prejudice, the defendant introduced the affidavits of John Farmer and Cela Atkins. The former testified that on the day before the trial of this case he was standing in front of the court-house in a few feet of W. S. Young, who was one of the jurymen trying this case, and heard Young say, in the presence of several other men around him, that if he was on the jury trying Mr. Stiles he would hang him, that there was too much of this killing, and it had to be stopped; that he was once opposed to capital punishment, but is not now. This witness did not know the persons with whom the juror was in conversation at the time, but could identify them if he saw them again. Cela Atkins swore that he was at the court-house of said county the day before the trial of the de-

fendant for the murder of John Hurt, that he had heard a man by the name of Young say that the defendant was guilty of killing John Hurt, and that if he was on the jury he would hang him, that something must be done, there was too much killing. He did not know the man, but some one standing near said his name was Young and he was a juryman. The attorneys for the defendant made affidavit that they had no knowledge or information, at the time the jury was empaneled and at the trial of the case, of the prejudice and disqualification of W. S. Young, and had not heard of the statement he made, as sworn by the affidavit of John Farmer, and did not know these facts until about the first of May, 1922, and had no means of knowing said facts. The defendant made an affidavit in which he stated that he did not know of the prejudice and disqualification of W. S. Young; that he did not know of the statement and facts set out in the affidavit of John Farmer, showing his prejudice and disqualification; and that the facts were not made known to him until after the trial of said case, and he had no means of knowing of such facts.

The State made a counter-showing. It introduced the affidavit of W. S. Young, who denied each and all the statements contained in the affidavits of John Farmer and Cela Atkins. This juror swore, that he had never been opposed to capital punishment, but has always been in favor of it, and made no statement relative to capital punishment as is set out in the affidavit of John Farmer; that the statements made in the affidavits of John Farmer and Cela Atkins were false in toto, except that he was a member of the jury which tried and convicted the defendant; that he was a member of the jury which tried James Douglass for the murder of Albert Catron, that as a member of said jury he listened to the evidence and argument in said case all day Tuesday; that the jury remained out all night Tuesday and until about ten o'clock Wednesday morning, at which time the jury reported. As soon as he was discharged as a juror in the Douglass case, he, two other members of the jury, and Mr. Johnson went to the drug-store, got a drink, and returned to the court-house, where Will Farmer, a brother of John Farmer, was on trial. He remained there until dinner, listened to said trial, and in conversation with no one. At the noon hour he went to a restaurant with J. G. Toles and John Johnson, and after

dinner returned to the court-house and listened to said trial until the court adjourned, and then went home. At no time during said day did he discuss the Stiles case with any one at all.

John Johnson, by affidavit, deposed that he was a member of the petit jury of the March term at Chattooga superior court, 1922; that he is acquainted with W. S. Young, that he went with Young on Wednesday, March 22d, the day before W. R. Stiles was tried for the murder of John Hurt, to a soda fount in Summerville about ten o'clock in the morning, that Young had been discharged as a member of the jury in the James Douglass case; that at the time the Douglass jury returned its verdict Will Farmer, a brother of John Farmer, was on trial for murder; that he and said Young returned to the court-house as soon as they procured a coca-cola; that they remained in the court-room until the noon recess; that he and Young had dinner at a restaurant in Summerville; that he returned with the juror to the court-room, where they both remained until the adjournment of the court, listening to the Farmer trial. During said day he did not hear the said Young make any statement to the effect that if he was taken on the Stiles jury he would hang Stiles, nor has he ever heard Young make any similar statement at any time or place; and if Young had made any such statement on said date, he would have heard it.

The court overruled the motion for new trial; and error was assigned upon this judgment.

*B. E. Neal, J. M. Bellah,* and *F. W. Copeland,* for plaintiff in error.

*George M. Napier, attorney-general, Eugene S. Taylor, solicitor-general, Seward M. Smith, assistant attorney-general,* and *J. F. Kelly,* contra.

HINES, J. (After stating the foregoing facts.)

1. It is urged that the verdict is without evidence to support it. The State relies solely for conviction on dying declarations made by the deceased. These declarations made out a case of murder. But counsel for the defendant urge that these dying statements were made when the deceased was intoxicated and under the influence of narcotics. It is further insisted, that these dying declarations are unreasonable, and that there was no reason or motive for the defendant to have taken the life of the deceased.

These were matters for the jury. We cannot take our seats in the jury-box, and decide the weight and credit to be given to these declarations of the dead man. We would be usurping the province of the jury.

The defendant introduced members of his family and a witness not of his household, who testified that the defendant was at his supper-table, eating his supper, at the time the fatal shot was fired. There was testimony from his witnesses of a statement of the deceased, that the latter accidentally shot himself. The conflict between the statements of the deceased and the evidence of the witnesses for the defendant, tending to establish an alibi and the accidental homicide of the deceased, was sharp. We know of no better tribunal for the solution of such conflicts than a jury of the vicinage. The credit to be given to these dying declarations was a question for the jury. They have resolved the conflict between them and the evidence tending to establish an alibi and an accidental homicide, in favor of these statements; and as the trial judge has approved their finding, his discretion will not be interfered with. *Hall* v. *State,* 124 *Ga.* 649, 651 (52 S. E. 891).

2. The competency of one of the jurors to try this case was challenged in the first special ground of the motion for new trial. This challenge was based upon the ground of the juror's bias and prejudice against the defendant. It was shown by the affidavits of two witnesses that this juror had declared on the day before the defendant was tried, that, if he was on the jury, he would hang the defendant, that there was too much killing going on, and that it had to be stopped. The State made a counter-showing, and introduced the affidavit of the juror in which he denied making the statements attributed to him in the affidavits of the witnesses for the defendant. In his affidavit the juror gave a narrative of his movements during the day upon which the witnesses for the defendant say he made the statements tending to show his bias and prejudice against the defendant, from which narrative the inference might be drawn that the attacking witnesses were mistaken in their evidence. A fellow-juror corroborated this narrative of the attacked juror. There was thus engendered a conflict in the evidence on this issue. The trial judge became the trior of this issue; and his finding that the juror was competent will not be reversed, it not appearing from all the facts that the judge abused his discretion. *McCrimmon* v. *State,* 126 *Ga.* 560 (55 S. E. 481).

3. In the absence of a proper request to charge upon that subject, the failure of the trial judge to charge the law touching impeachment of a witness by contradictory statements furnishes no ground for the grant of a new trial. *Crawley* v. *State,* 150 *Ga.* 586 (5) (104 S. E. 410).

*Judgment affirmed. All the Justices concur, except Gilbert, J., absent.*