41974. WRIGHT v. THE STATE.
(330 SE2d 358)

MARSHALL, Presiding Justice.

Fred LaDon Wright was tried by a jury, convicted of the murder and robbery of Joel C. Kitchens, and sentenced to life imprisonment

and 20 years' imprisonment, respectively.[1] The evidence authorized the jury to find the following facts.

On October 3, 1980, the 66-year-old victim visited Berry College in Rome, Georgia, for its annual weekend of alumni activities. He was registered at the Holiday Inn in Room 145.

At approximately 10:30 p.m., Kitchens went to the Fuzzy Duck Lounge. While there, he met the appellant and Steve Sliger, invited them to sit at his table, and paid for their drinks. The three men left the lounge shortly after midnight and went to Kitchens' room at the Holiday Inn.

Next to Kitchens in Room 143 were six young people, several of whom were also attending Berry College alumni activities. Three of these — Mark Burns, Jim Garner and Kelly Gantt, testified that at approximately 12:30 a.m., Kitchens, the appellant and Sliger noticed the group next door, joined them to talk and drink beer, and mingled back and forth between the two rooms. At approximately 3:00 a.m., Burns, Garner and Gantt went to Kitchens' room to get beer, but did not stay long, because the appellant and three unidentified girls from the lounge were there along with Sliger, who was on the telephone. About 15 minutes later, Kitchens, Sliger and the appellant returned to Room 143. The appellant and Sliger began smoking marijuana; the group in Room 143 objected, and asked the appellant and Sliger to leave. Kitchens stayed a few minutes then left shortly after the other two men.

Approximately 30 minutes later, the three unidentified girls who had been with the appellant and Sliger earlier, went to Room 143 in a panic. The girls had left the appellant and Sliger, but arranged to meet back with them at Kitchens' room. When they returned, the appellant and Sliger were gone and they saw, through the window, Kitchens tied up, lying on the floor. The three girls summoned help from Room 143 and then left the motel. Burns, Garner and Gantt found Kitchens' door locked, and saw Kitchens, beaten and lying on the floor.

Rome police arrived at approximately 4:30 a.m., to find Kitchens semi-conscious, lying face down, gagged, with his bloodied wrists and feet bound with pillow cases. The victim had been beaten and robbed. The room was in disarray. Identification documents, credit cards, papers and beer cans were scattered about, the bed covers were pulled

---

[1] The crimes were committed on October 4, 1980. The jury returned its verdict of guilty on April 14, 1984. A motion for new trial was filed on May 2, 1984, and overruled on November 21, 1984. Notice of appeal was filed on December 19, 1984, and the case was docketed in this court on January 22, 1985. After briefing, it was submitted for decision without oral argument on March 8, 1985. This is the second appearance of this case in this court. See *Wright v. State*, 251 Ga. 457 (306 SE2d 920) (1983).

back, and the furniture was moved. Bloodstains identified as the same type as the victim's blood were found on the pillowcases, pillow, bedspread, blanket, towel, and scrap paper.

Kitchens was taken to Floyd Medical Center, where he died of kidney failure two days later, his beating having caused multiple lacerations of the liver, small intestine and pancreas. There was expert testimony that the victim's rib and pancreatic fractures and abdominal injuries were inflicted by severe stomping. He also sustained blunt trauma injuries to the left side of the head and face.

The 'phone call made in the victim's room by Sliger was traced to Sliger's mother in Tennessee, and, pursuant to witness statements and the 'phone call, Sliger was arrested for aggravated assault and robbery on October 4. The appellant's and the victim's fingerprints were found on a beer can and a plastic cup found in the victim's room.

At the hospital, the victim stated to investigators and relatives that "Don and Steve," two boys that he met at the Fuzzy Duck, were the assailants who robbed him and beat him with their feet and fists. Officers testified that Kitchens' wallet, cash, and class ring were missing from his room.

The appellant was arrested on October 4 at the Bruce Motel in Summerville. Found during a search of his room, was a desk calendar belonging to Kitchens and a bloodied blanket. He had $80 cash on him at that time. In December, the appellant made a statement to police, in which he admitted meeting Kitchens at the lounge and going to his room, but stated that, in reference to the beating, he was being "railroaded" by Sliger.

Sliger's girl friend testified that she and Sliger canceled a date on October 4 because Sliger and the appellant planned to go out. When she asked the appellant after his arrest where the two men had gone the previous night, the appellant was evasive, and would not answer.

At trial, the appellant testified, in addition to basically the events stated hereinabove, that he and Sliger had drunk heavily and smoked marijuana on the night in question; that the three men were asked to leave Room 143 when Sliger attempted to sell some marijuana; that the three men went to Kitchens' room for a few minutes before the appellant and Sliger left the motel; that when he and Sliger started to leave, Sliger took something from the car trunk then disappeared for approximately five minutes while the appellant sat in the car; that he did not beat or stomp Kitchens, nor was he present during the beating; that he had no knowledge of the crime; and that on October 4, he wore suede shoes with rubber soles, and Sliger wore boots.

In rebuttal, two witnesses testified that Kitchens had confided to them that a disagreement arose during the night because Kitchens objected to the use of drugs in the motel rooms. The manager of the

motel in which the appellant was arrested testified that on October 4, the appellant paid, in cash, for a week in advance for his motel room.

1. The first enumerated error is the denial of the appellant's motion in limine, in which he had alleged that a statement made by a co-conspirator, Sliger, was inadmissible, because the conspiracy had ended and the co-conspirator did not testify at trial.

Rome City Police Captain Ragland testified at trial to the following effect: A taped statement was given by co-conspirator Sliger, who was apprehended before the appellant was arrested. When the appellant was subsequently arrested, he was advised of the *Miranda* warnings, he signed a waiver form,. and he was advised of the charges against him and the substance of evidence collected by the authorities, including Sliger's taped statement. When the appellant was asked if he desired to make a statement, he responded by asking if he could ask Sliger a question. The appellant asked Sliger, who was brought into the room, if he had told the authorities that the appellant "beat and stomped that old man," to which Sliger responded, "Yes, I did." Sliger was then removed from the room, and when the appellant was asked if he desired to ask Sliger anything else, he answered, "That's enough to send me to prison, isn't it?" The trial judge denied the appellant's motion for mistrial following the above testimony.

"[A] statement made to police by a conspirator, whether inculpatory or exculpatory as to the declarant, which statement incriminates the other conspirator as a party to the crime, also constitutes termination of the conspiracy. Thus, such statement by a conspirator is not made during the pendency of the criminal project and is not admissible under [OCGA § 24-3-5]." *Crowder v. State*, 237 Ga. 141, 153 (227 SE2d 230) (1976).

When the appellant testified, he admitted on cross-examination that the confrontation took place, and admitted the substance of the statements made at the confrontation with his co-conspirator. The appellant had been present at the time the questioned statements were made. The co-conspirator's statement resulted from the appellant's request to question him, and was in response to the appellant's question. The appellant's statement, that "That's enough to send me to prison, isn't it?" was made after he had been fully advised of the *Miranda* warnings. In view of this, and the other evidence tying the appellant to the crimes, we find no error.

2. The second enumerated error is permitting state's witnesses to testify about the victim's statement — that "Steve and Don" had beaten him — made prior to the time that the victim was aware of his impending death. See OCGA § 24-3-6. There was no error in admitting the statement, since there was evidence that the victim later made the same statement while fully aware of his impending death.

3. The third enumerated error is allowing the state to present testimony from rebuttal witness Patty Gentry, a nurse's aid in the emergency department at the hospital when the victim was brought in. The defense had called several witnesses in an attempt to establish that the victim was unconscious at the time he arrived at the hospital; that the victim did not name the appellant as a perpetrator of the crimes; that no one other than the police officers overheard the victim implicate the appellant; and, by implication, that the officers had fabricated the contention that the victim had named the appellant and his co-conspirator as his attackers. It was not error to allow the state's witness to testify, in rebuttal, that, in a conversation with the victim, he disclosed to her that two men had beaten him; that the victim had named "Steve and Don" as the perpetrators; and that she heard the victim give police Captain Ragland the names of Steve and Don as the perpetrators. *Taylor v. State*, 229 Ga. 536 (192 SE2d 249) (1972); *Wilson v. State*, 126 Ga. App. 145 (2) (190 SE2d 128) (1972). Although no foundation had been established at that time for a dying declaration, the same statements were testified to after the foundation was later established, hence the rebuttal testimony was merely cumulative.

4. The fourth enumerated error is the failure to give the following requested charge: "[I]n all criminal prosecutions, the defendant shall enjoy the right to be confronted with the witnesses against him; that is to say, he shall have the right to cross-examine the witnesses against him." This request states a constitutional principle and is not required to be given as an instruction by the court to the jury. It was not error to refuse to give the requested charge.

5. The fifth enumerated error is the failure to give the following requested charge: "[A] dying declaration may be impeached, that is to say, that doubt may be thrown upon its credibility by showing that the declarant made an inconsistent statement at some other time." Although this charge was not given verbatim, the trial judge extensively charged on the doctrine of dying declarations, instructing the jury that a dying declaration should be considered with and like all other testimony in the case; that the jury should determine the believability of a dying declaration along with the believability of all other testimony given to the jury during the course of the trial; and that a dying declaration should be received with great caution. The jury was also charged on credibility and impeachment. Failure to charge in the exact language of the requested charge was not error. *Shirley v. State*, 245 Ga. 616 (3) (266 SE2d 218) (1980). Furthermore, there was no evidence that the victim had made any inconsistent statement at some other time; there was some testimony to the effect that the deceased never named his assailants, but this was not an "inconsistent statement."

6. The sixth enumeration of error is the refusal to give the following requested charge: "[W]here it was manifestly impossible that the deceased could have seen his assailant or known certainly who he was, a mere expression of opinion as to who he was is not admissible as a dying declaration." The appellant urges that this was an appropriate charge in view of the testimony of the nurses who attended the victim, that the victim had repeatedly said he had passed out or gone to sleep at the time he was beaten.

"The weight, effect, reasonableness or unreasonableness of dying declarations are matters for the determination of the jury. *Stiles v. State*, 154 Ga. 86 (113 SE 208). 'Where it is manifestly impossible that the deceased could have seen his assailant or known certainly who he was, a mere expression of opinion as to who he was is not admissible as a dying declaration; but where want of knowledge does not appear either from the statement itself or from other evidence in the case, it must be presumed that the declarant stated a fact within his knowledge. In these circumstances it was a question for the jury whether the declaration represented the primary knowledge of the deceased or merely his opinion. Where the declaration by its terms, taken in connection with the circumstances, merely expresses the declarant's belief as to the identity of the guilty person, it should be excluded. If the declarant sees his assailant or assailants, and from appearances which he may describe he draws a conclusion as to his identity, it is admissible.' *Strickland v. State*, 167 Ga. 452, 457 (145 SE 879)." *Hawkins v. State*, 213 Ga. 749, 750 (101 SE2d 710) (1958). The evidence did not demand a finding that the decedent's statements were merely his opinion; therefore the failure to give this requested charge was not error.

7. The seventh enumerated error is the refusal to charge that "a dying declaration, if you [jury] find there has been a dying declaration made, may be used by the defendant for the purpose of showing his innocence, just as it may be used by the state to establish the defendant's guilt." The appellant contends that this charge should have been given because his defense rested almost exclusively on his own testimony that he was not physically present in the motel room when the victim was assaulted and robbed, and on his strong challenge to the credibility of the police officers and their account of what Kitchens may have told them about how he received his injuries.

The requested charge was not supported by the evidence at trial. The dying declaration indicated that the appellant was guilty of assault, which would later result in murder, and robbery; the declaration did not, in any manner, show his innocence. The matter of the credibility of the police officers was addressed by the thorough charges on impeachment and credibility. It was not error to refuse to give this requested charge.

*Judgment affirmed. All the Justices concur, except Bell, J., who concurs specially.*

BELL, Justice, concurring specially.

I concur in the judgment but not with all that is said in the first division of this court's opinion. In the first division the majority states that "[w]hen the appellant testified, he admitted on cross-examination that the confrontation took place, and admitted the substance of the statements made at the confrontation with his co-conspirator." Thus, the majority appears to implicitly hold that appellant's admissions during cross-examination constituted a waiver of his objection to the admission of Sliger's statement.

However, the appellant so testified only after the substance of Sliger's statements had already been introduced into evidence by Captain Ragland. Our Code provides that, "[i]f on direct examination of a witness objection is made to the admissibility of evidence, neither cross-examination of the witness on the same subject matter nor the introduction of evidence on the same subject matter shall constitute a waiver of the objection made on direct examination." OCGA § 24-9-70. Because appellant moved in limine to exclude Sliger's statement and objected at trial to Ragland's testimony, his own testimony on cross-examination did not, as the majority implies, constitute waiver of his objection, and I therefore respectfully cannot agree with this court's reliance on appellant's testimony to uphold the admission of Sliger's statement. Nevertheless, in my view the remaining reasons outlined in the first division are sufficient to uphold the trial court's decision to allow Sliger's statement, and I therefore concur with the judgment reached in the first division.

DECIDED JUNE 10, 1985 —
REHEARING DENIED JUNE 27, 1985.

*Christopher A. Frazier,* for appellant.

*F. Larry Salmon, District Attorney, Michael J. Bowers, Attorney General, Eddie Snelling, Jr., Senior Attorney,* for appellee.