## 30858. CROWDER v. THE STATE.

HILL, Justice.

Defendant Claude Thomas Crowder, Claude Berry, and Ava Johnson were indicted on November 12, 1974, for the murder of Ruth Park Crowder, the defendant's wife. Mrs. Crowder was found on May 28, 1974, in bed, murdered with an ax. At the trial co-indictee Ava Johnson testified as a witness for the state. Shortly after being indicted and prior to defendant's trial, co-indictee Berry died as a result of an apparently self-inflicted gunshot wound. Statements made by the deceased Berry and his confession taped by police at Grady Hospital 9 days prior to Berry's death were admitted into evidence against the defendant, who was found guilty of murder and sentenced to life imprisonment.

On Tuesday, May 28, 1974, at about 5:30 p.m. police officers received a call from defendant Crowder, stating that he thought his wife had been killed. Police on patrol were informed by radio and proceeded to the defendant's residence. In an upstairs bedroom police found the deceased wife of the defendant lying in bed covered by sheets with a pillow over her head. A bloody hatchet was lying on the bed, along with a white pair of women's gloves. On the wall was written "death to the rich bitch." Several drawers were partially pulled from the dresser next to the bed, although there was on the dresser a jewelry cabinet containing money which was undisturbed.

The victim was clothed in a blood-soaked nightgown. She was found to have been killed by a chop-type laceration to the left upper neck. There were two similar chop-type lacerations in the left upper back. There were also small wounds above and behind the left ear which possibly were produced with the blunt end of the hatchet.

A finding was made by the chief forensic pathologist for Atlanta that the victim was killed between 7:30 a.m. and 9:30 a.m. the morning of May 28th.

The downstairs door in the back of the house leading into the workshop and basement had been found standing ajar by the defendant's son and a friend upon returning from school that afternoon. The boys shut and locked the door, but did not discover the body then. The friend testified that the door did not look like it had been forced open.

A police officer testified that he investigated the scene of the murder shortly after the defendant's phone call and that there were no signs of forced entry anywhere in the house. He testified that the bed clothes of the victim did not appear to be disturbed, but were in the position they would be in if she had been asleep when killed. He stated that the circumstances at the scene of the murder did not indicate theft as a motive, because there were no bloodstains underneath the bloody hatchet found on the bed sheets (indicating that it was placed on the bed some time after the murder, after the blood had dried), yet only one dresser drawer was actually ransacked, money and coins were found in several drawers, the jewelry cabinet was undisturbed, other valuables were within plain view in the room, and the rest of the house was not ransacked.

The officer testified that during the course of his investigation the defendant asked the police to see if the church money was in its place in a cabinet in the den and indicated to them a spot at the back of a shelf where this money should be. The money was gone, although nothing else in the cabinet was disturbed. (Mrs. Crowder had been in charge of taking the weekly church offerings to the bank to deposit.) The officer testified that the defendant gave a specific account of his activities during that day.

Ava Johnson, a prostitute jointly indicted with the defendant and Berry, testified for the state as follows: On May 21, 1974, she met the defendant in front of a gas station in Columbus, Georgia. He winked at her and asked her to have some coffee with him. During the conversation over coffee, the defendant asked her if she knew anyone who would kill his wife for him. The coffee shop was next door to the motel where the defendant was

staying. The defendant invited her to his room, which she thought was number 21, for a drink. In the room he again asked her if she knew someone who would kill his wife. She told him she did not. The defendant then gave her a ride to meet her friend, Berry. When Ms. Johnson told Berry of the defendant's proposition, Berry stated that if the man was paying, Berry would do the job. Ms. Johnson testified further that she returned to the defendant's room, where the defendant and Berry discussed the killing in her presence. The defendant told Berry that he wanted his wife killed and offered to pay from five to ten thousand dollars. The defendant drew a blueprint of his house on a piece of cardboard on the back of a tablet and gave it to Berry, indicating how to get in and out of the house. Ms. Johnson identified the defendant in court as the man she saw in Columbus. She also identified a photo of the defendant's truck as the truck of the man she saw. On cross examination, Ms. Johnson denied that she and Berry had framed the defendant. She testified that she never saw the defendant again after that meeting.

The clerk at the motel in Columbus testified that defendant Crowder was registered in room 23 from May 21 to 23 and that he stayed at that motel regularly every 8 weeks. The clerk testified that he works the 3 to 11 p.m. shift and that although someone could possibly have gotten into the defendant's room without the clerk's knowledge, the defendant did not complain to him about someone having been in his room.

Robert Estes, a friend of Berry's in the army at Fort Benning, testified that Berry told Estes that a man had approached him through Ava Johnson to kill his wife in Atlanta and that Berry was going to do it. Berry said that the man wanted his wife killed because she would not give him a divorce, that Berry was to be paid $5,000, and that the back door of the man's house would be left open for him. He described the plan for the killing, including coming out of the woods behind the house, entering through the unlocked rear door, and climbing the stairs to the upper level.

Estes testified further that Berry went AWOL for two or three days shortly after this conversation. Then during the last week in May, Berry returned and told

Estes that he had committed the murder. Berry said that he had used an ax to chop the woman's head off, that she was in bed, and that he left a "calling card" so people would know that he had done it. Berry said that he had gotten in through the open back door and that he had tried to make it look like a robbery by stealing some things and taking money that had been left for him to steal. Berry indicated that he was also going to be paid to kill the man's lover's husband. Berry had a large sum of money with him at that time. Estes told police in Columbus what he knew.

James Russ, a soldier, testified that Berry told him that he was going to kill a man's wife for money, and that it would be done in the morning after the man and his son left, but before the wife was awake.

Anthony Thomas, another soldier, testified that Berry went AWOL in May. He talked about killing a man's wife in Atlanta. In July, Thomas said Berry showed him a stack of money which looked like two or three thousand dollars.

A telegraph operator in Charlotte, North Carolina, testified that a man named Ralph Berry sent $200 to Claude Berry from Charlotte to Fresno, California, on August 9, 1974. The victim's sister testified that defendant Crowder was in Charlotte at a funeral on August 9, 1974.

Berry's wife testified that Berry told her he had killed a white man's wife and was to get $5,000 from him.

Eric Smith testified that on August 16, 1974, he was arrested in Atlanta with Berry for firing a revolver in the air. Berry needed money for bail and told Smith that a man owed him money for Berry's having acted as a "hit man." Berry said he killed a woman. Berry told Smith to meet the man in a described car at a specific location for the money. Berry then made a phone call. Smith met the car, and the driver gave Smith $300. Smith sat in the car opposite the driver. Smith identified the defendant as the man in the car. Smith testified that Berry used the name Berry Allen.

Robinson Wynder testified that he was arrested in Atlanta on August 16 with Eric Smith and a man known as Berry Allen. He identified a photo of Claude Berry as

the man he had known as Berry Allen. He testified that he was with Eric Smith when money was picked up from a man and he identified the defendant as that man.

Shirley Walton, a woman whom Berry knew, testified that he asked her to keep a look-out while he killed a woman. She testified that Berry said he was going to kill the woman with an ax. Berry had a drawing of the house layout on a piece of cardboard tablet backing. She said the house belonged to "some Claude." She also testified that she went with Berry to the bus station in Atlanta to meet this man in May, but that she only saw the man from the rear as he followed Berry into the bathroom. Berry came out with $200.

Larry Averette, a prison cellmate of the defendant's, testified as follows as to a statement made by the defendant during a card game: " . . . the case was kind of blown out, because the man that he was supposed to have hired got killed, and that the only thing he was really worried about was — the only thing that could hang him would be what the man said in his statement; and he went into about what they could use in the statement, about what the man said." Averette testified that Crowder had mentioned a woman possibly having seen him pass money to the man, but said it was his word against the woman's.

Sgt. Douglas K. Andrews of the DeKalb County Police Department gave the following testimony: He arrested Claude Berry on November 4, 1974, at the Fort MacPherson army hospital and transferred him to Grady Hospital. After arriving at Grady, Berry was read the warrant charging him with the murder of Ruth Crowder and was advised of his rights. Berry stated that he understood his rights and wanted to talk with the police. (At this point the jury was excluded from the courtroom.) The first comment that Berry made relating to the case was: "If I tell you what I know, Crowder will kill me." He then said: "I can tell you what you need to know about Crowder, but I can't — but I'm not involved." After being assured of police protection Berry then went on to tell Sgt. Andrews about being introduced to the defendant, Claude Crowder, by someone named Ava in a motel room in Columbus, Georgia. Berry stated that he and Crowder discussed price, how the murder would be done, the

leaving of the basement door open, and that Crowder "wanted her possibly drowned in the bathtub, or . . . make it look like a crazy man did it, rape her or something like that." Berry said that about a week later he came to Atlanta and read in the paper about Mrs. Crowder being killed. He called Crowder and asked for some money, stating that he figured Crowder would think he had done it since Crowder had probably asked so many people that he would not know who had killed her. Berry then told of meeting the defendant in the bus station in Atlanta where the defendant gave Berry some money. Berry also stated that the defendant sent money from North Carolina to Berry in Fresno, California, and that the defendant used the name Ralph Berry when he sent the money. Berry was shown five photographs and identified a photograph of the defendant as the man he knew as Claude Crowder. (The foregoing will be referred to hereinafter as Berry's first statement.)

Sgt. Andrews then told Berry that he didn't believe he was telling the whole truth and asked if he wanted to tell it. Berry then admitted that he killed Mrs. Crowder and gave permission to have his statement taped. (This admission and the taped statement will be referred to hereinafter as Berry's confession.)

At the time the taped confession was begun, neither the defendant Crowder nor Ava Johnson had been arrested and the full extent of their participation was not known to the police. The defendant was arrested several hours after the confession and Ava Johnson was arrested several days later.

Berry had been shot in the left side of his lower abdomen with a handgun. The wound apparently was self-inflicted. His statements to the police were interrupted by hospital staff as they administered treatment. Berry had a tube coming out of his nose, a tube coming out of his side and a bag attached to his stomach. He was classified as being in "intensive care." He was in pain and asked for a shot to kill the pain, which was administered shortly before the confession. He died nine days later from the gunshot wound.

Before the confession was taped, Berry was again warned of his rights. The taped confession, consisting of

questions by Sgt. Andrews and answers by Berry, was basically as follows: In May, Berry met a prostitute named Ava Johnson in Columbus, Georgia. He left her in front of a hotel and went to do some business. She was picked up by Claude Crowder. When Berry returned for her, she was gone. He was at a light when a yellowish El Camino truck pulled up. The occupants were Ava Johnson and a man that was a stranger to Berry. Ms. Johnson got into the car with Berry and asked him if he wanted to make some money, saying that the man in the truck had a job. Berry went to the motel with Ava to talk to the man, Mr. Claude T. Crowder. After Crowder fixed drinks, he said that he wanted his wife dead because he had found someone he wanted to marry and divorce would take too long. He drew plans of his house and how to get there and offered $5,000 to Berry. Berry left. The next day he again met with Crowder at the motel and listened to details such as no dogs, no neighbors, the door being left open, what time, which day, and how he would be paid. Berry agreed to do the job. A Tuesday after a holiday Monday (Memorial Day) was decided on. The son would be at school, Crowder would leave for work, and the church money would still be in the house so that the motive would look like robbery. Berry was told where this money was. On Tuesday, May 28, 1974, he drove past the house, parked at a church, and entered the back basement door. He was early so he sat in the basement waiting for Crowder and his son to leave. He saw Crowder come downstairs to make sure the door was open. When he heard Crowder and his son leave, he went up the back steps into the upper part of the house, saw Mrs. Crowder sleeping, and sat down to collect his nerves. He returned to the basement and took an ax off the workbench, returned upstairs and entered the bedroom. He stood looking at the victim for moment, then hit her, first with the blunt end to knock her out, then with the sharp end. Berry stated that she was on the left side of the bed and that he hit her from the right. He covered her head with a pillow and returned to the front of the house. He opened one of two wall closets in the den and took the church money, which was in a blue zipper bag. He took the ax back to the basement, along with a pair of woman's gloves. He then returned to the bedroom, wrote "death to

the rich bitch" on the right-hand wall with an ink pen, opened the clothes closet, and then left. He called Crowder the next night. At first Crowder said it was impossible to have a meeting, but Berry insisted. They met in the bus station bathroom, where Crowder told Berry that police were everywhere. He told Berry to open a post office box and he would mail him money. Berry was asked if he had been paid all the money but at this point Berry said he was tired and asked if he could finish the next day. The tape was never finished.

Objections were made to admission of the tape on the grounds that the conspiracy had been concluded and the confession was not admissible under the statements of the co-conspirator exception to the hearsay rule. Objection was also raised as to the voluntariness of the confession due to the fact that Berry had been given a drug to kill pain shortly before it was taped. These objections were overruled and the jury returned. Officer Andrews repeated his testimony concerning Berry's arrest and questioning. The taped confession was tendered into evidence and was objected to on the additional ground that proper voice identification had not been made. This objection was overruled and the tape was played to the jury.

At the conclusion of the tape, Andrews was asked whether the following information had been made public at the time of the murder: the contents of the writing on the wall, type of weapon used, color of the bank bag, number of cabinets in the den, method of entry, and whether or not the victim's head was covered with a pillow. Andrews replied that only the method of entry had been made public.

Andrews testified that the defendant was not taken to the hospital for personal identification because Berry had identified him from a photograph. At this point, the state rested its case.

The defendant's son testified that there was nothing different about his father's normal breakfast ritual on the day his mother was murdered. He said he never viewed any discord between his parents.

Various neighbors and friends testified as to the defendant's good reputation in the community. One

neighbor testified that Crowder stayed in her home after the murder and that someone was with him constantly except when he was asleep. This neighbor's husband testified that the defendant slept at their house after the murder, that someone was with him at all times except when he was sleeping, and that he did not believe it was possible that the defendant had gotten out of the house at night without his knowledge.

Defendant Crowder testified in his own behalf. He stated that the day of the murder, he got up, had breakfast with his son, carried the garbage out, and left for work at 7:25. He went first to an automobile dealer's in Fairburn and had coffee. He made other calls that day and finished in Carrollton at 4:25. He left there and returned home, arriving at approximately 5:20. He went into the bedroom and saw his wife's body. He did not disturb the scene other than to lift the pillow and put his hand on her leg. It was cold. He saw the ax on the bed and left the room. His daughter drove up outside and he told her he thought her mother had been killed. He called the police, went outside and waited five minutes, called again, and went back outside to wait. The police came, and he took them to the bedroom. The defendant stated that he showed police a clipboard of his day's activities in response to their questions. He testified that they would not let him move his car and that he was allowed in the house only once before the funeral, accompanied by a policeman. He stated that the police asked him what might be missing. He told them that the church money might be gone. At trial he stated that he couldn't remember any other things of value in the house. The police told him that he was a prime suspect until they found someone else. They asked him to take a polygraph test, which he did.

Crowder stated that he had been in Columbus on May 21 and 23, 1974, that he had been going to Columbus as a regular part of his sales route for 5 years, and that he usually checked in at 5:30 or 6:00 p.m. On this occasion, he relaxed a while, then walked downtown and ate. He walked back to the motel and entered his room. He noticed the smell of smoke, which he considered odd since he doesn't smoke. One of his business cards and a lot of business pens were missing from the top of a dresser

where he had left them. He walked to the night clerk's desk and asked who had been in his room. He then went for a walk. When he returned, a black lady was standing by his room. She asked him if he wanted a date and he said no. A black guy walked up, and the two strangers followed him into his room and asked to use the phone. The defendant testified that he had no conversation with these people, but that one of them picked up a pen and said: "Well now, Mr. Crowder, we ain't going to harm you." Then they left at his request.

He stated that he loved his wife, that they had no disagreements and he had never discussed divorce. He admitted that he had sharpened the ax the night before the murder and left it on the workbench. He later admitted his daughter's rebuttal testimony as to his discussions with her about divorce, but said that he had made those comments only as light conversation.

The defendant enumerates two errors for consideration on appeal, as follows: The trial court committed reversible error by (1) admitting the taped confession of Claude Berry into evidence in that his confession was made after termination of the criminal conspiracy, and (2) admitting into evidence the testimony of police officers recounting statements made to them by Berry prior to the making of the taped confession. We begin with the first enumeration.

The state concedes, as must be done, that the taped interrogation of Berry and his answers constitute a confession. Thus we have the taped examination of Berry by police played before the jury. Conspirator Crowder was not present at that interrogation and hence was neither confronted by Berry nor given the opportunity to cross examine him.

No decision has been cited, and we have found none, in which the state was permitted to introduce into evidence at the trial of one conspirator its ex parte examination of another conspirator not testifying at the trial in which that conspirator confessed his and the defendant's participation in the crime. The existing law is to the contrary. *Hill v. State,* 232 Ga. 800 (1) (209 SE2d 153) (1974); *Lingerfelt v. State,* 231 Ga. 354 (3) (201 SE2d 445) (1973); *Gibbs v. State,* 144 Ga. 166 (1) (86 SE 543)

(1915); *Smallwood v. State,* 132 Ga. App. 186 (2) (207 SE2d 671) (1974). See also Douglas v. Alabama, 380 U. S. 415 (85 SC 1074, 13 LE2d 934) (1965), and Brookhart v. Janis, 384 U. S. 1 (86 SC 1245, 16 LE2d 314) (1966).

The state argues (1) that no proper objection was made when the tape was played to the jury; (2) that the tape was admissible under the conspirator's exception to the hearsay rule, Code Ann. § 38-306; (3) that the tape was admissible as an exception to the hearsay rule under Code Ann. § 38-309; (4) that the tape was admissible as a manifest necessity exception to the hearsay rule; and (5) that if the tape was inadmissible, the error was harmless.

Objection to the tape on the ground that it was not admissible in that it was made after the conspiracy had ended and thus did not come within the conspirator's exception, was made at the conclusion of the Jackson-Denno hearing. It was overruled and thus it was not waived by failure to remake it when the jury returned and the tape was replayed.

The Georgia law dealing with the admission into evidence against a criminal defendant of statements made by a conspirator is contained in two sections of our Code. Code Ann. § 38-306 provides: "After the fact of conspiracy shall be proved, the declarations by any one of the conspirators during the pendency of the criminal project shall be admissible against all." Code Ann. § 38-414 provides: "The confession of one joint offender or conspirator, made after the enterprise is ended, shall be admissible only against himself." The state relies upon the former; the defendant upon the latter. We are called upon to delineate the two.

It is clear that the fact (existence) of conspiracy was proved. Ava Johnson testified directly as to its formation. Others testified as to its continuation. Thus the preliminary requirement of Code Ann. § 38-306 was satisfied. It is equally clear that the Berry tape constituted a confession.

The question thus is whether that confession was inadmissible because made "after the enterprise is ended" (§ 38-414) or admissible because made "during the pendency of the criminal project" (§ 38-306). The two sections are mutually exclusive. As stated in *Hill v. State,*

supra (p. 803): "Both these Code sections clearly contemplate a point in time in certain cases when the conspiracy, including its concealment stage, is at an end so as to render a subsequent confession by an alleged co-conspirator inadmissible in the trial of a defendant who continues to deny his guilt." Thus the sections do not overlap and a conspirator's statement is made either "during" or "after" the conspiracy.

Under our law "the pendency of the criminal project" includes the accomplishment of the crime itself. It may also include acts performed and declarations made after the commission of the crime (see *Burns v. State,* 191 Ga. 60, 73 (11 SE2d 350) (1940) and *Smith v. State,* 47 Ga. App. 797, 803 (171 SE 578) (1933)), one of which is concealment of the identity of the perpetrators. *Chatterton v. State,* 221 Ga. 424 (5) (144 SE2d 726) (1965), cert. den., 384 U. S. 1015; *Evans v. State,* 222 Ga. 392, 402 (150 SE2d 240) (1966), aff., as Dutton v. Evans, 400 U. S. 74 (91 SC 210, 27 LE2d 213) (1970).

As stated in *Evans v. State,* supra, 222 Ga. at 402: "The rule is that so long as the conspiracy to conceal the fact that a crime has been committed or the identity of the perpetrators of the offense continues, the parties to such conspiracy are to be considered so much a unit that the declarations of either are admissible against the other."

On the other hand, we held in *Munsford v. State,* 235 Ga. 38, 43 (218 SE2d 792) (1975), that confessions by Williams and Daniels, made to police after their arrests, which statements incriminated Munsford, were inadmissible against Munsford because those statements were not made in concealment of the conspiracy.

We hold that a confession made to police by a conspirator (in which other conspirators are identified and their participation is described) is not made during the pendency of the criminal project (i.e., is not made during the concealment phase of the conspiracy) but is made after the enterprise is ended. Such confession therefore is not admissible under Code § 38-306 and is inadmissible at the trial of the conspirator under Code § 38-414. This was the rule stated in *Munsford v. State,* supra, and we adhere to it.

The state argues that the purpose of this conspiracy

included the murder of the husband of the defendant's lover and thus the object of the conspiracy had not been completed. The state also argues that at the time the confession was taped, Crowder and Ms. Johnson had not been arrested and that their identity and extent of participation were not known. Nevertheless, when Berry was arrested and began his confession to police the criminal enterprise had ended.

Having recognized a confession made to police by a conspirator (in which other conspirators are identified and their participation in the crime is described) as constituting termination of the criminal project, we turn now to Berry's first statement to police in which he identified Crowder and stated that Crowder tried to procure someone to kill his wife, but sought to conceal that he (Berry) was the perpetrator of that murder.

The reason for including the concealment phase of the conspiracy under Code Ann. § 38-306 and treating the conspirators as a unit cannot be said to apply where one conspirator discloses the identity and participation of another conspirator to police; i.e., where one conspirator directs the attention of law enforcement officials toward and points the finger of blame at another conspirator. At that point, the bond between the conspirators is broken and their unity is dissolved.

Where a conspirator states to police that another person committed a crime but that the declarant had no part in it, declarant is seeking to pin the blame on the other and escape punishment for himself. Such a statement, besides being inherently untrustworthy, cannot be said to be in furtherance of concealment of the identity and participation of the other conspirator in the crime.

We hold that a statement made to police by a conspirator, whether inculpatory or exculpatory as to the declarant, which statement incriminates the other conspirator as a party to the crime, also constitutes termination of the conspiracy. Thus, such statement by a conspirator is not made during the pendency of the criminal project and is not admissible under Code Ann. § 38-306. Anything to the contrary in the per curiam opinion in *Bennett v. State,* 231 Ga. 458 (1) (202 SE2d 99)

(1973), regarding the Lingerfelt statement will no longer be followed.

The result in this case would be no different if we were to reverse the order of defendant's enumerations of error. Moreover, the result would be no different if we were to treat Berry's first statement and his confession together as a unit, as the district attorney urges us to do. Where one conspirator identifies another conspirator to police and describes for them the other's participation in the crime, the concealment phase of the conspiracy has ended.

The state argues that the taped confession was admissible as a declaration against interest under Code Ann. § 38-309. The state urges that a confession is against the penal interests of the defendant. Code Ann. § 38-309 provides that "The declarations and entries by a person, since deceased, against his interest, and not made with a view to pending litigation, shall be admissible in evidence in any case." Without deciding whether the confession of a dying conspirator is a statement against his interest, we find that after commission of a crime, a confession made to police by a conspirator under arrest on a warrant charging him with that crime, which confession identifies and describes the participation of another conspirator, is made with a view toward litigation within the meaning of the Code section and thus Code Ann. § 38-309 does not render such confession admissible.

Although the defendant's enumerations of error raised questions of Code §§ 38-306 and 38-414, we are not unaware that Code § 38-414 has constitutional support in the Sixth Amendment right to confrontation and cross examination, as well as our own Bill of Rights (Code Ann. § 2-105). Just as Code § 38-306 must be kept separate from Code § 38-414, § 38-306 must be kept separate from the Sixth Amendment and Code Ann. § 2-105. We therefore must reject the argument that Berry's confession was made admissible by manifest necessity.

We turn now to the question of harmless error. Because of the constitutional support underpinning Code Ann. § 38-414 and the line which must be drawn between Code § 38-306 and the right of confrontation, we consider the question of harmless error in accordance with

constitutional standards (as the state has argued). To do otherwise would result in one standard when the Code sections are cited and another when the corresponding constitutional provisions are cited.

It is true that parts of Berry's first statement and taped confession were cumulative of other testimony; e.g., the testimony of Ava Johnson as to the meeting at the motel in Columbus, and the testimony of Shirley Walton as to the meeting on May 29 at the bus station in Atlanta, and the testimony as to the telegraphing of $200 from North Carolina to Berry in California. On the other hand, Berry's confession alone fixed the planned date, described the details of this ax murder, and described the location of the church money in a den closet in a blue bag. Moreover, Berry's first statement contained the prejudicial suggestion that the victim be raped. The state's case was largely circumstantial without Berry's confession, whereas with it conviction was almost inescapable. Thus, we cannot find Berry's statement and confession to be harmless beyond a reasonable doubt as required by Chapman v. California, 386 U. S. 18 (87 SC 824, 17 LE2d 705) (1967). Moreover if, as the dissent in Schneble v. Florida, 405 U. S. 427 (92 SC 1056, 31 LE2d 340) (1972), urges, the Chapman test of harmless error has been relaxed, it nevertheless appears that there is a reasonable possibility that the improperly admitted evidence contributed to the conviction. Schneble v. Florida, supra; see *State v. Hightower,* 236 Ga. 58 (222 SE2d 333) (1976).

There is a difference between a conviction based upon circumstances and one based upon the perpetrator's confession which describes an ax murder and incriminates the defendant. That difference gives rise to the reasonable possibility that Berry's statement and confession contributed to the conviction. We therefore cannot accept the argument that the admission of such evidence constituted harmless error.

In view of the foregoing, we find reversible error as to both errors enumerated.

*Judgment reversed. All the Justices concur, except Nichols, C. J., Jordan and Hall, JJ., who dissent.*

ARGUED MARCH 9, 1976 — DECIDED JUNE 29, 1976.

*Joseph M. Salome, Robert S. Windholz,* for appellant.

*Richard Bell, District Attorney, Leonard W. Rhodes, Assistant District Attorney, Arthur K. Bolton, Attorney General, James L. Mackay,* for appellee.

HALL, Justice, dissenting.

I dissent to a reversal of this conviction. The majority opinion fails to distinguish between Berry's statement to the police that, "If I tell you what I know, Crowder will kill me," and his later confession. The statement was made at a time when both parties were concealing their participation in the crime. This utterance falls clearly within the scope of Code § 38-306, and is not a "confession" within the meaning of Code § 38-414. It was properly admitted into evidence as an act of a co-conspirator "during the pendency of the criminal project." See *Munsford v. State,* 235 Ga. 38 (218 SE2d 792) (1975); *Hill v. State,* 232 Ga. 800 (209 SE2d 153) (1974); *Evans v. State,* 222 Ga. 392 (150 SE2d 240) (1966); *Burns v. State,* 191 Ga. 60 (11 SE2d 350) (1960).

With respect to the erroneous admission of the confession, "The mere finding of a violation of the Bruton rule in the course of the trial . . . does not automatically require reversal of the ensuing criminal conviction . . . [w]e must determine [the issue] on the basis of 'our own reading of the record and on what seems to us to have been the probable impact . . . on the minds of an average jury.' Harrington v. California. . . In Bruton the court pointed out that 'a defendant is entitled to a fair trial but not a perfect one'. . . Thus, unless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction, reversal is not required." Schneble v. Florida, 405 U. S. 427, 430, 432 (1972). For a later decision holding a Bruton violation harmless, see Brown v. United States, 411 U. S. 223 (1973). Harmless error was also found on an inadmissible confession in Milton v. Wainwright, 407 U. S. 371 (1972).

The evidence of guilt as set forth in the majority opinion is overwhelming in this case.

I would affirm the conviction.

I am authorized to state that Chief Justice Nichols and Justice Jordan concur in this dissent.