## A08A1161. RAYSHAD v. THE STATE.
(670 SE2d 849)

PHIPPS, Judge.

Rasaul Malik Rayshad was convicted of the armed robbery of Richard Love, two counts of aggravated assault upon Love and his wife, and two counts of kidnapping the Loves. On appeal, Rayshad argues that the evidence was insufficient; that his trial counsel rendered ineffective assistance by failing to protect him from inadmissible, prejudicial evidence; and that certain counts should have been merged for sentencing purposes.

We reverse because Rayshad has demonstrated merit in his claims that his trial counsel was ineffective and that the evidence was insufficient to support the kidnapping convictions. Rayshad's sentencing contention is thus moot. Because the evidence was sufficient to support the armed robbery and aggravated assault convictions, Rayshad may be retried on those counts.[1]

The state's competent evidence showed the following. During the night of January 26, 2004, Love and his wife were awakened by

---

[1] See *Lively v. State*, 262 Ga. 510, 512 (3) (421 SE2d 528) (1992).

noises of individuals breaking into their home. Love found cover under their bed, but his wife was seen by three men who entered their bedroom. One of the men was wearing a mask; the other two were not. The men pointed guns at Love's wife and ordered her to the floor; she complied. The men asked whether her husband was at home, and demanded money. When Love stood beside the bed with arms raised, the men pointed their guns at him and ordered him to the floor. He complied, and they bound his hands and feet. Because the house alarm had begun sounding, the men grabbed Love's wife, threw her near the alarm pad, and ordered her to shut off the alarm. After she did so, one of the men threw her back across the floor near her husband and then bound her hands and feet.

The men persisted in demanding money; one of them demanded to know the location of the Loves' safe. Love twice described the location. After each time, the man left the room to search for it, could not find it, and returned to the bedroom, demanding to be told the location of the safe and threatening to otherwise kill Love's wife. Love's wife then agreed to show the man the safe, and he dragged her from the bedroom, through an adjoining bathroom, and into a closet where the safe was located. When the man found the safe empty, he dragged Love's wife back through the bathroom and into the bedroom. Meanwhile, one of the men kept his gun pointed at Love, while threatening to kill him. In response to the men's continued demands for money, Love's wife told the men about money under the mattress. The men took the money and left the house. The police arrived moments later.

At about 6:30 the next morning, Love's friend, Fred Williams, called and asked to see him immediately. When the two met, Williams volunteered that he knew who had broken into Love's residence. Love and Williams went to the county sheriff's office and reported what they knew about the criminal matter.

At trial, Williams testified to the following. At about 7:00 on the night in question, he met Rayshad at a restaurant. Rayshad was with two other men, James Mercer and George Roberts. Williams testified that Rayshad wanted to ''get back at'' Love for an apparent dispute between them. Thus, the purpose of the meeting was for Rayshad to set out a plan to rob Love. According to Williams, Rayshad had ''brought the other two guys in . . . to do a job''; and the two men appeared to have been in agreement with the plan. Rayshad knew where Love lived and had visited his residence during the two or three years they had known each other. At the meeting, there was discussion that Love generally kept money inside the house, and a plan was developed for breaking into it. Williams, however, tried to dissuade the others from robbing Love. He called Love later that evening, but got no answer.

After reporting what he knew to the sheriff's office, Williams made telephone calls to Rayshad, which were recorded by sheriff's office personnel. Williams testified that during the calls, he asked, "in so many words," about the robbery. In the first call, Rayshad denied having had anything to do with the robbery. In one call, Rayshad stated that he would call "them" and find out what they had done after the meeting. In all calls, Rayshad maintained that he had gone home after the meeting at the restaurant.

Rayshad was arrested about 30 minutes after his last call with Williams. Mercer and Roberts were both arrested within 30 days. Love's wife subsequently identified Mercer from a photographic lineup as one of the intruders. But neither she nor Love could identify the other assailants.

Testifying at trial, Rayshad denied planning or otherwise participating in the crimes. He recounted that he had been good friends with Love for about three years; that their friendship had grown from transacting drug deals together; and that Williams, with whom he had been good friends for about five or six years, had introduced him to Love.

Rayshad admitted that he was at the restaurant on the night in question, but said he was there to broker a drug deal between Love and Williams on one side and his (Rayshad's) friend Mercer, along with Mercer's partner, Roberts, on the other. Williams's role was to contact Love, who would supply marijuana. Roberts's and Mercer's role was to supply the money. But because Love did not answer Williams's repeated telephone calls and therefore did not come to the restaurant, no drug transaction occurred.

Rayshad further testified that while at the restaurant, he overheard Roberts say to the others, "I wouldn't mind robbing [Love]. He could stand a good licking." Rayshad testified that neither he nor Williams had taken Roberts's comments seriously. Rayshad took Mercer and Roberts to their residence before going to his own home at about 8:30, where he remained until the next morning. Rayshad called as a witness a relative with whom he was living at the time, and she corroborated Rayshad's claim that he was at home from about 8:30 that night until the next morning.

Rayshad testified that he did not know about the criminal incident at the Loves' residence until Williams called him the next day. He played for the jury an audiotape of the telephone calls. The tape was paused intermittently for Rayshad's recap that certain dialogue pertained to the failed drug deal attempt and other dialogue showed that he had not been involved with the crimes perpetrated at the Loves' residence.

1. Rayshad challenges the sufficiency of the evidence. He points

out that he was neither alleged to have been at the Loves' house nor identified as one of the intruders. Regardless of whether Rayshad was at the Loves' residence when the crimes were perpetrated, "[e]very person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime."[2] A person is concerned in the commission of a crime if he "[i]ntentionally advises, encourages, hires, counsels, or procures another to commit the crime."[3] "Any party to a crime who did not directly commit the crime may be indicted, tried, convicted, and punished for commission of the crime upon proof that the crime was committed and that he was a party thereto."[4] And the state is not required to specify in the indictment that it is charging the defendant as a party to the crime.[5]

Rayshad wholly denied involvement with the commission of the crimes, but Williams testified that Rayshad had plotted the criminal episode and recruited Mercer and Roberts to execute it. And Mercer was identified by Love's wife as one of the men who perpetrated the crimes against her and her husband.

Witness credibility is a matter for the jury.[6] At the appellate stage,

> [t]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. In addition, appellant no longer enjoys a presumption of innocence. An appellate court determines only the legal sufficiency of the evidence adduced below and does not weigh the evidence or assess the credibility of the witnesses.[7]

Where there is some competent evidence, even though contradicted, to support each fact necessary to make out the state's case, we must uphold the jury's verdict.

(a) Construed in the light most favorable to the prosecution, the evidence was sufficient to authorize the jury to find Rayshad guilty

---

[2] OCGA § 16-2-20 (a).

[3] OCGA § 16-2-20 (b) (4).

[4] OCGA § 16-2-21.

[5] *John v. State*, 282 Ga. 792, 793 (2) (653 SE2d 435) (2007).

[6] *Rankin v. State*, 278 Ga. 704, 705 (606 SE2d 269) (2004).

[7] *Davis v. State*, 270 Ga. App. 777-778 (1) (607 SE2d 924) (2004) (citation and footnote omitted); see *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

of one count of armed robbery[8] and two counts of aggravated assault.[9]

(b) The evidence was insufficient, however, to sustain Rayshad's convictions for the two counts of kidnapping[10] because there was no showing of asportation under the standard set forth by the Supreme Court of Georgia in *Garza v. State*.[11] Therein, the Court overruled the "slight movement" standard for asportation and adopted a test first articulated in *Govt. of the Virgin Islands v. Berry*,[12] explaining:

> The *Berry* test . . . assesses four factors in determining whether the movement at issue constitutes asportation: (1) the duration of the movement; (2) whether the movement occurred during the commission of a separate offense; (3) whether such movement was an inherent part of that separate offense; and (4) whether the movement itself presented a significant danger to the victim independent of the danger posed by the separate offense.[13]

The Court in *Garza* instructed that an assessment of such factors determines

> whether the movement in question is in the nature of the evil the kidnapping statute was originally intended to address — i.e., movement serving to substantially isolate the victim from protection or rescue — or merely a "criminologically insignificant circumstance" attendant to some other crime.[14]

Applying the *Berry* factors to the evidence in this case, it is clear that the movements of neither Love nor his wife constituted the necessary asportation to support a kidnapping conviction. The act of forcing Love from a standing position to lying on the floor was of minimal duration and occurred during the course and incidental to the crimes of armed robbery and aggravated assault, and this act did not significantly increase the dangers to him over those he faced as a victim of armed robbery or aggravated assault.[15]

---

[8] See OCGA § 16-8-41 (defining armed robbery).

[9] As to each aggravated assault count, the indictment charged that Rayshad committed assault "with intent to rob with a handgun, a deadly weapon." See OCGA § 16-5-21 (a) (defining aggravated assault).

[10] OCGA § 16-5-40 (a) (defining kidnapping).

[11] 284 Ga. 696 (670 SE2d 73) (2008).

[12] 604 F2d 221 (3d Cir. 1979).

[13] *Garza*, supra at 702 (1).

[14] Id. (citation omitted).

[15] See id. at 703-704 (2) (asportation not shown where victim was hit in the head with

The acts concerning Love's wife, while involving a greater quantum of movement than that as to Love, nonetheless fail to show asportation under the *Berry* test. The record reflects that Love's wife was forced to the bedroom floor; thrown about the room; dragged from the bedroom, through an adjoining bathroom, into a closet to point out a safe; then dragged back into the bedroom, following the same route. These movements were of short duration and were incidental to the crimes of aggravated assault and armed robbery. There was no evidence that these movements enhanced significantly the risk she was already facing during the commission of these crimes.[16]

Accordingly, Rayshad's kidnapping convictions must be reversed.

2. Rayshad contends that the trial court erred by rejecting his claim of ineffective assistance of counsel. To prevail on a claim that counsel was ineffective, "a defendant must show both prongs of the *Strickland* test, i.e., that counsel's performance was deficient and that this deficient performance prejudiced the defense."[17] To satisfy the deficient performance prong,

> [Rayshad] must show that his trial lawyer made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Included among the factors for assessing professional performance are whether trial counsel adequately investigated the facts and the law; and whether the omissions charged to him or her resulted from inadequate preparation rather than from unwise choices of trial tactics and strategy.[18]

To satisfy the prejudice prong, Rayshad must show " 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' "[19]

---

gun, causing her to fall to floor, or where victim was forced to rise and sit in chair, where she was bound).

[16] See id. at 704 (3) (grabbing victim in house, forcing victim into an adjoining bedroom, and forcing victim to walk down hallway to retrieve items did not show asportation element of kidnapping).

[17] *Boseman v. State*, 283 Ga. 355, 358 (3) (659 SE2d 364) (2008), citing *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984).

[18] *Hardeman v. State*, 281 Ga. 220-221 (635 SE2d 698) (2006) (punctuation omitted), citing *Strickland*, supra at 687 (III) and *Johnson v. Zant*, 249 Ga. 812, 813 (1) (295 SE2d 63) (1982).

[19] *Hardeman*, supra at 221, quoting *Strickland*, supra at 694 (III) (B).

Both prongs of the ineffectiveness inquiry are mixed questions of law and fact.[20] In reviewing a trial court's determination regarding a claim of ineffective assistance of counsel, this court upholds the trial court's factual findings unless they are clearly erroneous; we review a trial court's legal conclusions de novo.[21]

Rayshad asserts that the core issue for the jury was the extent, if any, of his involvement in the crimes perpetrated upon the Loves. As to this issue, Rayshad claims, the case was essentially a credibility contest between Rayshad and Williams. Rayshad argues that his trial lawyer's errors resulted in four instances of the introduction of evidence that diminished his credibility and bolstered that of Williams to tip the scales in the state's favor.

(a) *Deficient performance prong*. First, Rayshad complains that his trial lawyer introduced in evidence a video recording of Williams's interview at the sheriff's office. The trial transcript shows that Rayshad's lawyer was seeking to impeach Williams with prior inconsistent statements he made during that interview.

Rayshad asserts that his character was impermissibly placed in evidence because the video recording contained an officer's remark that a background check on Rayshad had shown a prior arrest. We agree with Rayshad that the better practice was for trial counsel to have redacted the remark from the video recording, rather than gratuitously exposing to the jury his arrest history having nothing to do with the instant case. The passing reference, however, did not place Rayshad's character in evidence.[22]

Rayshad also argues that it was unwise trial strategy to try to impeach Williams by showing the jury Williams's police interview. "A witness may be impeached by contradictory statements previously made by him as to matters relevant to his testimony and to the case."[23] Rayshad asserts, however, that any benefit of pointing out the discrepancies between Williams's police statement and his trial testimony were outweighed by the damaging effects of reinforcing to the jury Williams's version of events.

---

[20] *Lajara v. State*, 263 Ga. 438, 440 (3) (435 SE2d 600) (1993).

[21] *Suggs v. State*, 272 Ga. 85, 88 (4) (526 SE2d 347) (2000).

[22] Compare *Copprue v. State*, 279 Ga. 771, 772 (2) (621 SE2d 457) (2005) (reviewing instances where evidence that the defendant had been incarcerated did not impute bad character) and *Isaac v. State*, 269 Ga. 875, 877-878 (5) (505 SE2d 480) (1998) (determining that testimony that defendant had been in jail and had a probation officer constituted passing references that did not place defendant's character in evidence) with *Lindsey v. State*, 282 Ga. 447, 450 (2) (651 SE2d 66) (2007) (finding reversible error where inadmissible evidence of defendant's arrest history was "pervasive and breathtaking in scope" and was admitted without any limiting instruction, and the jury was allowed to infer that defendant was a person of bad character and that he had the propensity to commit the charged crimes based on nothing more than unproven allegations).

[23] OCGA § 24-9-83.

"The standard regarding ineffective assistance of counsel is not errorless counsel and not counsel judged ineffective by hindsight, but counsel rendering reasonably effective assistance."[24] The test for reasonable attorney performance is whether a reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial.[25] Under the circumstances, we cannot say that defense counsel's strategy was unreasonable, and we will not use hindsight to second-guess that strategy.[26]

Second, Rayshad argues that his trial lawyer erred by not objecting when the state elicited as impeachment evidence his testimony that he had entered a guilty plea to a charge of theft by receiving a stolen car. We agree. Rayshad's plea had been accepted under the First Offender Act;[27] he had since successfully completed probation and been discharged without an adjudication of guilt.[28] "[U]nless there is an adjudication of guilt, a witness may not be impeached on general credibility grounds by evidence of a first offender record."[29] Here, where there was no adjudication of guilt, Rayshad's tender of a guilty plea was inadmissible as impeachment evidence.[30] Rayshad's trial lawyer's failure to object to this evidence could not have been reasonable trial strategy.

Third, Rayshad correctly argues that his trial lawyer erred by not objecting to, and even introducing in evidence, out-of-court statements of Mercer, who did not testify. After Mercer was apprehended a few days after the incident, a sheriff's office investigator interviewed him while he was being held in jail.

The investigator testified as a witness for the state that Mercer told him the following about Rayshad's involvement in the crimes perpetrated against the Loves. Rayshad and Love had transacted drug deals together in the past. For some months prior to the night in question, Rayshad had been complaining to Mercer that Love owed him money, but would not pay. Rayshad thus wanted Mercer and Mercer's friend, Roberts, to go to Love's house to recover the

---

[24] *Lewis v. State*, 279 Ga. 69, 75 (9) (608 SE2d 602) (2005) (punctuation and footnote omitted).

[25] *Franks v. State*, 278 Ga. 246, 250 (2) (599 SE2d 134) (2004).

[26] See *Welbon v. State*, 278 Ga. 312, 313 (2) (602 SE2d 610) (2004); *Johnson v. State*, 266 Ga. 380, 382 (2), n. 3 (467 SE2d 542) (1996) (trial strategy, which is ill-advised or even erroneous as shown by hindsight, may not itself constitute deficient performance); *Stewart v. State*, 263 Ga. 843, 847 (6) (440 SE2d 452) (1994) (fact that appellant and his present counsel now disagree with difficult decisions regarding trial tactics and strategy made by trial counsel does not require finding of deficient performance), overruled on other grounds, *Wall v. State*, 269 Ga. 506, 508-509 (2) (500 SE2d 904) (1998).

[27] See OCGA § 42-8-60 et seq.

[28] See OCGA § 42-8-62.

[29] *Matthews v. State*, 268 Ga. 798, 802 (4) (493 SE2d 136) (1997) (footnote omitted).

[30] See id.

debt. Mercer had not known Love and had not known where he lived until Rayshad drove him by the Loves' residence. Rayshad told Mercer that Love usually kept substantial amounts of cash at his residence; that he (Rayshad) wanted back only the amount Love owed him; and that Mercer and Roberts could keep any remaining amount of cash they obtained. On the night in question, Rayshad, Mercer, and Roberts met Williams at the restaurant to discuss details of breaking into Love's residence. Williams confirmed Rayshad's claim that Love generally kept large amounts of cash inside the residence, and Williams advised them about vicious dogs Love kept on his property. Mercer, however, was dissatisfied with the scanty degree of planning and thus backed out of going to the residence. Rayshad also did not go to the Loves' residence that night.

During cross-examination of the sheriff's office investigator, defense counsel showed the jury the video recording of Mercer's interview with the investigator. Defense counsel paused the video recording to ask the investigator various questions concerning his interpretations and opinions of Mercer's responses. The recording showed Mercer describing Rayshad's involvement and naming Roberts and two other individuals (but not Rayshad) as the perpetrators who had entered the Loves' residence and robbed them.

Unquestionably, evidence of Mercer's out-of-court declarations constituted inadmissible hearsay. Although the state referred to Mercer as Rayshad's co-conspirator, this characterization did not render Mercer's statements admissible. "[D]eclarations of a conspirator, made during the course of a conspiracy, including the concealment stage, are admissible against co-conspirators."[31] Where one conspirator identifies another conspirator to police and describes for them the other's participation in the crimes, however, such declarations are not made during the pendency of the criminal project and are not admissible.[32] Mercer's declarations were given in response to police questioning at the sheriff's office days after the crimes were committed, and the declarations implicated Rayshad. Plainly, Mercer's statements were not made during the course of any conspiracy with Rayshad and therefore were not admissible as declarations of a conspirator.[33] The introduction of Mercer's statements trampled upon Rayshad's right to confrontation.[34] Rayshad's

---

[31] *Jones v. State*, 265 Ga. 84, 85 (2) (453 SE2d 716) (1995) (citation omitted).

[32] *Crowder v. State*, 237 Ga. 141, 152-153 (227 SE2d 230) (1976).

[33] See id.; OCGA § 24-3-52 (confession of a conspirator made after the enterprise has ended shall be admissible only against himself).

[34] *Brooks v. State*, 271 Ga. 698 (1) (523 SE2d 866) (1999) (introduction of a nontestifying joint offender's confession showing defendant's involvement in the crimes violated the defendant's constitutional right to confrontation); see also *Crawford v. Washington*, 541 U. S. 36, 68 (124 SC 1354, 158 LE2d 177) (2004) (admission of out-of-court statements that are

counsel's failure to protect his client from them could not have been reasonable trial strategy, but was deficient performance.

Fourth, Rayshad correctly argues that his trial counsel erred by not objecting to, and even introducing in evidence out-of-court statements of Roberts, who did not testify. Roberts was apprehended about a month after the incident and was interviewed by a captain of the sheriff's office. The captain testified on direct examination that Roberts gave the following account of Rayshad's involvement in the crimes at issue. The idea to rob Love had originated with Rayshad, who thus drove Roberts and Mercer to the restaurant to meet with Williams to devise a plan. Roberts had not met the Loves, but Mercer had shown him their residence. Later, on the night in question, Roberts drove Mercer and two other individuals (but not Rayshad) to the Loves' residence. Only Mercer and the two other individuals went into the house; they returned to the vehicle with cash and a television. Roberts had understood that a certain amount of the cash would go to Rayshad.

The captain went on to testify on cross-examination about Roberts's own trial in connection with the crimes perpetrated upon the Loves. The captain recalled that Roberts had testified that Rayshad had been instrumental in setting up the robbery. The captain also read various portions of Roberts's trial testimony, and defense counsel introduced in evidence an excerpt of Roberts's trial transcript containing Roberts's testimony. The captain testified that ultimately, however, Roberts had pled guilty to one count of armed robbery, two counts of aggravated assault, and two counts of kidnapping.

There is no question that evidence of Roberts's out-of-court declarations constituted inadmissible hearsay. Notwithstanding the state's characterization of Roberts as Rayshad's co-conspirator, Roberts's declarations — the first of which was not made until Roberts had been apprehended and was implicating Rayshad in a police interview — were not made during the pendency of any criminal project between the two of them and thus were not admissible as declarations of a conspirator.[35] The introduction of Roberts's statements trampled upon Rayshad's right to confrontation.[36] Trial counsel's failure to protect Rayshad from the hearsay

---

testimonial in nature violates the Confrontation Clause unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination); see *Davis v. Washington*, 547 U. S. 813, 822 (II) (126 SC 2266, 165 LE2d 224) (2006) (statements in response to police interrogation are testimonial when the circumstances objectively indicate that there is no ongoing emergency and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution).

[35] *Crowder*, supra; OCGA § 24-3-52.

[36] *Brooks*, supra; see also *Crawford*, supra (the term "testimonial" includes testimony at

could not have been reasonable trial strategy, but was deficient performance.

(b) *Prejudice prong*. We agree with Rayshad that the core issue for the jury's determination was his involvement, if any, in the charged criminal acts. While the evidence on this issue was sufficient under *Jackson v. Virginia*,[37] it was not overwhelming, notwithstanding Love's wife's identification of Mercer and the evidence of Rayshad's statements during telephone conversations with Williams. The jury was not required to find that the identification of Mercer proved that Mercer had perpetrated the crimes at Rayshad's behest; and the audio recordings of the telephone calls were only intermittently decipherable and then certainly not overwhelmingly decisive of whether Rayshad had sent the men to Love's residence to commit the crimes. Notably, the jury asked in a note to the judge during deliberations, "We would like to review the audiotape. If a transcript is available, that would be preferred." The judge told them that no transcript was available, and the jury resumed deliberations without listening again to the audiotape. Thus, as Rayshad contends, this case hinged in large part upon a credibility contest between him and Williams.

However, Rayshad's credibility was compromised by trial counsel's errors. Through inadmissible evidence, the jury was told that Rayshad had confessed to theft by receiving a stolen car. "Generally in a criminal trial, proof that the defendant committed a distinct, independent, and separate offense is highly and inherently prejudicial."[38] The jury could have inferred from these instances of inadmissible evidence that Rayshad was a person of bad character with the propensity to commit theft,[39] which according to the prosecution, was the underlying reason for the intrusion into the Loves' residence.

Trial counsel's errors further resulted in Williams's account being corroborated by numerous instances of the inadmissible hearsay statements of Mercer and Roberts. The jury was repeatedly told by sheriff's office personnel that these two purported accomplices had detailed Rayshad's involvement, while minimizing their own. Mercer claimed in his police statement that he never went to the Loves' residence, having backed out due to scanty planning; Roberts claimed in his police statement that he merely drove the others to the

---

a former trial); *Davis*, supra.

[37] See Division 1 (a), supra (finding sufficient evidence to support the armed robbery and aggravated assault convictions).

[38] *Johnson v. State*, 275 Ga. 508, 510-511 (3) (570 SE2d 292) (2002) (citation and punctuation omitted).

[39] See *Lindsey*, supra; *Johnson*, supra.

Loves' residence, but did not go inside. "Where a conspirator states to police that another person committed a crime but that the declarant had no part in it, declarant is seeking to pin the blame on the other and escape punishment for himself."[40] Such a statement is "inherently untrustworthy."[41] Yet Rayshad had no opportunity to confront and cross-examine either Mercer or Roberts.

What is more, the jury was shown Mercer's police interrogation, during which Mercer — garbed in jail clothing and shackled about his wrists and ankles — pointed to Rayshad to explain his predicament. The jury was told that Roberts had implicated Rayshad at his own trial and that Roberts had ultimately pled guilty to charges that mirrored those underlying this case.

We find a reasonable probability that trial counsel's deficient performance resulted in inadmissible evidence that influenced the jury. The jurors' struggle to discern the extent of Rayshad's culpability in the charged criminal acts is evidenced by two notes they sent to the judge during deliberation. In one, as discussed above, the jurors requested the audiotape or preferably a transcript of Rayshad's telephone conversations with Williams. In another note, the jurors asked, "If another crime is committed in conjunction with a crime which has been planned, is the person who planned the 1st crime also culpable for the 2d crime (even though it may not have been part of the 'plan')." The jurors' focus on impermissible hearsay is evidenced by a third note to the judge, stating, "We would like to see the transcript that was entered into evidence from Roberts's trial." Given the record before us, we find a reasonable probability that, but for counsel's deficient performance, the result of Rayshad's trial would have been different.

*Judgment reversed. Barnes, C. J., and Johnson, P. J., concur.*

DECIDED DECEMBER 1, 2008.

*Steven M. Frey*, for appellant.
*Scott L. Ballard, District Attorney, Warren A. Sellers, Gail M. Travillian, Assistant District Attorneys*, for appellee.

---

[40] *Crowder*, supra at 153.
[41] Id.